ELBA MARÍA MARTÍNEZ, demandante, recurrente y recurrida, *v.* PABLO MCDOUGAL, demandado, recurrido y recurrente.

*Números:* RE-85-349          *Resueltos:* 4 de mayo de 1993
RE-85-355

*Sabino Cotto Cruz,* abogado del recurrente; *José A. Cuevas Segarra,* abogado de la recurrida.

EL JUEZ ASOCIADO SEÑOR REBOLLO LÓPEZ emitió la opinión del Tribunal.

El presente recurso nos permite resolver si el padre, que de manera intencional e injustificada se niega a reconocer

a un hijo habido fuera de matrimonio, le responde a este hijo al amparo de las disposiciones del Art. 1802 del Código Civil de Puerto Rico, 31 L.P.R.A. sec. 5141, por los daños y perjuicios que el hijo pueda haber sufrido con motivo de la negativa injustificada de reconocerlo; controversia que no resolvimos, o que dejamos inconclusa, en *García v. Acevedo*, 123 D.P.R. 624 (1989). *Resolvemos en la negativa*; veamos por qué.

## I

Los hechos que dan lugar a los recursos consolidados del epígrafe son sorprendentemente sencillos.

La demandante Elba María Martínez, mujer de treinta y seis (36) años de edad, radicó demanda ante el Tribunal Superior de Puerto Rico, Sala de Mayagüez, contra Pablo McDougal, su alegado padre, en la cual solicitó ser declarada hija de éste. En adición, *y como segunda causa de acción*, reclamó los daños y perjuicios alegadamente sufridos por ella como consecuencia de la negativa injustificada de reconocerla.

Originalmente, el demandado McDougal negó que fuera el padre de la demandante. Con posterioridad a llevarse a cabo unos exámenes sobre histocompatibilidad, McDougal aceptó la paternidad, *quedando pendiente la causa de acción relativa a los daños y perjuicios reclamados*. Celebrado el correspondiente juicio, el tribunal de instancia declaró con lugar la demanda radicada, condenando al demandado al pago de una suma de quince mil dólares ($15,000) por concepto de los sufrimientos y angustias mentales sufridos por la demandante, dimanantes de la negativa injustificada de reconocimiento, durante el año

inmediatamente anterior a la fecha de la radicación de la demanda.([1])

Aun cuando así específicamente no se hace constar, el dictamen del tribunal de instancia se fundó, en primer término, en la reconocida y reiterada doctrina a los efectos de que para que exista responsabilidad bajo las disposiciones del Art. 1802 del Código Civil, ante, la parte actora debe demostrar que el demandado incurrió en una acción u omisión negligente o culposa, la ocurrencia de un daño y la correspondiente relación causal entre el daño sufrido por dicha parte actora y la conducta negligente o culposa del demandado. Se concluyó y se resolvió, en segundo lugar, por el tribunal de instancia que todo padre tiene el "deber jurídico" de reconocer a los hijos que procrea y que la *"omisión"* —intencional, culposa o dolosa— en que incurre al así no hacerlo da lugar a una causa de acción en daños bajo el citado Art. 1802 del Código Civil.

Inconformes, *ambas* partes acudieron en revisión ante este Tribunal.([2]) Expedimos, y consolidamos, ambos recursos.

---

([1]) El foro de instancia, en adición, condenó al demandado al pago de la cantidad de dos mil dólares ($2,000) por concepto de honorarios de abogado, más las costas del proceso.

([2]) La demandante Elba María Martínez le imputó al foro de instancia haber errado "al conceder compensación por los *daños continuos* que sufrió la demandante *por solamente* el año anterior a la radicación de la demanda". (Énfasis suplido.) Solicitud de revisión, pág. 2.

Por su parte, el demandado McDougal le imputó al referido foro haber errado:

"[a.] ... al declarar con lugar la reclamación de daños y perjuicios de la recurrida basada en la supuesta culpa y negligencia del recurrente por éste no haberla reconocido como su hija legítima.

"[b.] ... al declarar sin lugar la defensa de prescripción, y en su consecuencia condenando al recurrente al pago de una compensación por los supuestos daños y perjuicios irrogados durante el año anterior (1981–82) a la radicación de la demanda.

"[c.] ... al declarar no ha lugar la defensa de incuria.

"[d.] ... cuando condenó al recurrente a pagar honorarios de abogados." Oposición a solicitud de revisión, págs. 2–3.

## II

La procedencia jurídica en nuestra jurisdicción de la acción en daños del hijo contra el padre ha sido objeto de detenida consideración por parte de este Tribunal en, por lo menos, cuatro (4) ocasiones anteriores; *todas ellas, sin embargo, en relación con demandas radicadas contra el padre por hijos procreados durante el matrimonio de sus progenitores.*

■ La primera de ellas —ocasión en que, por decirlo así, establecimos la "regla general" a seguir en esta clase de situaciones— lo fue la decisión que emitiéramos en *Guerra v. Ortiz*, 71 D.P.R. 613 (1950); caso en que el hijo demandó al padre por los daños que sufriera mientras transitaba en un vehículo de motor perteneciente a, y que manejaba, su padre. Expresando que la unidad de la familia, la institución de la patria potestad y las relaciones paterno filiales *"están de por sí investidas de un alto interés público y social, tanto para beneficio del hijo como para beneficio del estado"*, nos negamos a reconocer la existencia de una causa de acción en estas situaciones al amparo de las disposiciones del Art. 1802 del Código Civil, ante, por razón de que el así hacerlo "sería abrir una brecha peligrosa en la unidad de la familia, constituida bajo el régimen de la patria potestad ejercida por el padre, o por la madre en los casos señalados por el [A]rtículo 152 [del Código Civil] ...". (Énfasis suplido.) *Guerra v. Ortiz*, ante, págs. 623 y 619.

Ello no obstante, en *Fournier v. Fournier*, 78 D.P.R. 430 (1955), le reconocimos el derecho, bajo las disposiciones del citado Art. 1802, a una hija menor, no emancipada, a instar acción contra su padre por los daños ocasionádoles por éste al *matar* a la madre, *mediante un acto de carácter delictivo*, estando la madre y el padre divorciados y la hija bajo el cuidado y custodia de la madre, hija que no tenía relación alguna con el padre. Expresamos en dicha decisión

que, al establecer la antes expuesta doctrina en *Guerra v. Ortiz*, ante, *no* había sido nuestra intención enunciarla como una norma absoluta, esto es, "para concederle inmunidad a los padres contra acciones de los hijos basadas en culpa y negligencia, *por la sóla circunstancia del nexo natural que los une, sin estar justificada la inmunidad por consideraciones de orden público*". (Énfasis suplido.) *Fournier v. Fournier*, ante, pág. 432. Aclaramos que en *Guerra v. Ortiz*, ante, pág. 432, el curso de acción seguido estaba plenamente justificado "porque habiendo unidad familiar que proteger y relaciones paternofiliales que conservar, permitir que la acción tuviera éxito, hubiera sido contrario a y en detrimento y menoscabo de la política pública" que favorece la unidad de la familia. Concluimos expresando que:

> Es evidente que en *Guerra v. Ortiz*, supra, *había algo que conservar*, mediante la aplicación de dicha doctrina, *algo cuya destrucción debía evitarse, no sólamente en bien del hijo, s[ino] que en provecho del orden social.* A cambio de ello, el exigir al allí demandante que renunciara a reclamar del padre una indemnización, tenía plena justificación. *¿Pero que hay aquí que pueda salvarse en aras de la política pública, y que pueda ofrecérsele a los hijos en sustitución de su reclamación contra el padre?* ... La doctrina que no permite que los hijos demanden a sus padres en cobro de indemnización, por culpa o negligencia, puede en ocasiones, dar lugar a consecuencias rigurosas y duras, *y su alcance no debe ser ampliado más allá de los límites, sancionados por las razones que le dan justificación y respaldo.* (Énfasis suplido.) *Fournier v. Fournier*, ante, pág. 433.

La "segunda excepción" a la norma expuesta en *Guerra v. Ortiz*, ante, fue establecida en *Drahus v. Nationwide Mutual Ins. Co.*, 104 D.P.R. 60 (1975), caso en que una hija demandó a la compañía de seguros del padre por los daños que sufriera en un accidente mientras la esposa del asegurado, y madre de la hija demandante, conducía el automóvil del padre. En una decisión, a nuestra manera de ver las cosas un tanto carente de sensibilidad y que denota un exagerado sentido materialista de la vida, este Tribunal

resolvió que la utilización de la acción directa contra la compañía de seguros que establece el Código de Seguros hace desaparecer *"ipso facto*, el más leve motivo de preocupación por la integridad y la paz familiar que inspiraron nuestro dictamen en *Guerra v. Ortiz*, ante", *Drahus v. Nationwide Mutual Ins. Co.*, ante, pág. 63, ya que "[c]uando los daños están cubiertos contractualmente por un asegurado que a todas luces no está comprendido en el ámbito afectivo de la familia, la acción no genera la animosidad ni las relaciones tirantes entre padre e hijo que caracterizan la confrontación adversativa, *ni se empobrecerá el capital de la familia"*. (Énfasis suplido.) Íd. Dicho de otra manera, y en forma cruda, este Tribunal resolvió en el citado caso de *Drahus v. Nationwide Mutual Ins. Co.* que si la acción radicada no le afecta el patrimonio al padre, la acción resulta procedente en derecho.

Finalmente, en *García v. Acevedo*, ante —caso en que anulamos una sentencia que, a pesar que declaraba que el demandado era padre de la demandante a los fines de concederle alimentos a esta última, no reconocía todos los demás derechos filiatorios que como hija ésta tenía bajo nuestra Constitución— *no* nos expresamos, por no estar adecuadamente planteado, sobre la procedencia jurídica de la acción en daños que la hija había instado contra el padre por razón de la alegada negativa injustificada de éste de reconocerla como tal. Devolvimos el caso a instancia para que dicho foro, en su momento, resolviera si el demandado era responsable en daños "y si la preservación de la unidad familiar y la posible confusión entre los bienes de la hija [demandante] y de su padre impiden la indemnización solicitada". *García v. Acevedo*, ante, pág. 637.

## III

Es un hecho *históricamente incuestionable* que toda la legislación liberalizadora aprobada durante la década de

los años cuarenta (40) relativa a las relaciones paterno fi-
liales; la clara intención de los integrantes de la Comisión
de la Convención Constituyente encargada del estudio de
la Carta de Derechos de "eliminar el estigma jurídico en
contra de los hijos habidos fuera del matrimonio" y de co-
locar "a todos los hijos respecto de sus padres y respecto del
orden jurídico en igualdad de derechos"; la disposición de
nuestra Carta de Derechos a los efectos de que todos "los
hombres son iguales ante la Ley" (Art. II, Sec. 1, Const.
E.L.A., L.P.R.A., Tomo 1, ed. 1982, pág. 257), y que no se
"podrá establecer discrimen alguno por motivo de ... [entre
otros] ... nacimiento" (íd.); la disposición de la Ley Núm. 17
de 20 de agosto de 1952 (31 L.P.R.A. sec. 441) de que todos
"los hijos tienen respecto a sus padres y a los bienes relic-
tos por éstos, los mismos derechos que corresponde a los
hijos legítimos", y la normativa decisión que este Tribunal
emitiera en *Ocasio v. Díaz*, 88 D.P.R. 676 (1963), y su pro-
genie, *no sólo tuvo el propósito* de equiparar desde un
punto de vista estrictamente económico-jurídico a los hijos
no matrimoniales con los matrimoniales, *sino que necesa-
riamente tuvo que tener el propósito, o fin primordial, de
fomentar la unión en el plano afectivo y familiar.* Real-
mente nos resulta imposible concebir esta situación de otra
manera *porque, si así no fuera, meramente seríamos una
amalgama, o reguerete, de personas y no un pueblo inte-
grado por personas pensantes y sensibles.*

■ Nuestra función y norte, por ende, como tribunal
de justicia, *que tiene la obligación de fomentar e implemen-
tar la política pública del Estado Libre Asociado de Puerto
Rico de protección y fortalecimiento de la institución de la
familia,*([3]) debe siempre ser la de promover la unidad entre
ese hijo habido fuera de matrimonio y su padre. *Rechaza-
mos en consecuencia, la adopción de cualquier norma juris-*

---

([3]) Véase Exposición de Motivos de la Ley Núm. 85 de 12 de septiembre de
1990, Leyes de Puerto Rico, págs. 475–485.

*prudencial que tenga el efecto de promover la separación, la discordia y el odio entre ese padre y ese hijo*; efecto nocivo que indudablemente tendría el establecimiento de la causa de acción en daños que reconoció el tribunal de instancia.

Dicha norma sería una en *abierta contravención* de la *sabia doctrina* establecida, hace más de cuarenta (40) años, en el citado caso *Guerra v. Ortiz*, ante. No resulta convincente el argumento de que en *Guerra v. Ortiz*, ante, había una relación paterno filial que proteger y que en el caso de autos no existe al presente relación alguna entre el padre y la hija. *Si es que ello es así, nuestro deber es fomentar dicha relación paterno filial; nunca puede ser nuestra función la de acrecentar la separación y discordia entre ellos*. La norma que hoy rechazamos le proveería a ese hijo meramente un beneficio económico que es parcial y temporal. La misma posiblemente le impida al hijo la obtención de un beneficio mucho mayor y mejor: una relación paterno filial, afectiva y permanente, con su padre.[4]

Por otro lado, debe señalarse que las decisiones que, a manera de excepción de la doctrina establecida en *Guerra v. Ortiz*, ante, emitiera este Tribunal en los casos *Drahus v. Nationwide Mutual Ins. Co.*, ante, y *Fournier v. Fournier*, ante, *no* son aplicables al caso de autos. En cuanto al primero, basta con decir que en casos como el presente la compensación económica al hijo provendría del propio peculio del padre y no de una compañía de seguros, hecho que consideró controlante el Tribunal en el caso *Drahus v. Nationwide Mutual Ins. Co.*, ante. En cuanto al caso *Fournier v. Fournier*, ante, somos del criterio que la situación de hechos presente en dicho caso es una *sui generis* que es distinguible de la del presente caso. Allí no se trataba meramente de una situación en que no existía relación paterno-filial entre la hija y el padre. *Había algo más*: el acto

---

[4] Una acción como la que reclama la demandante no tan sólo puede tronchar la posibilidad de una futura relación entre el hijo que demanda y su padre, sino que, además, puede afectar la relación con sus hermanos de padre.

delictivo del padre de quitarle la vida a la madre de la menor demandante; situación de la cual difícilmente podía nacer y florecer una relación paterno-filial en el futuro. A diferencia del caso *Fournier v. Fournier*, ante, e independientemente del hecho de que al presente las relaciones no sean cordiales, en el caso de autos *no existe una situación anormal* que pueda tener el efecto de impedir un acercamiento entre el padre y la hija en el futuro.

## IV

No podemos avalar la posición contraria; hacerlo sería abrir una *peligrosa brecha* que permitiría que *cualquier* hijo, sea matrimonial o no, pudiera demandar en daños y perjuicios a su padre *por razón del incumplimiento de éste con cualesquiera de los deberes que le impone el ordenamiento a todo padre.* A manera de ejemplo, y sin tener que hacer mucho esfuerzo, se nos ocurre pensar en el padre que —de manera intencional y culposa— incumple con la obligación que tiene de *alimentar* a su hijo; situación que, desafortunadamente, es común y corriente en nuestro País. Si implantáramos la norma contraria, esos hijos podrían radicar —en adición a la correspondiente demanda por alimentos— una acción en daños y perjuicios contra sus padres; situación que, a todas luces, no parece ser una muy deseable desde muchos puntos de vista.

Sobre el derecho de los hijos a radicar dicha acción contra el padre que ha incurrido de manera intencional en la omisión del deber de alimentarlos, a la luz de la norma que hoy rechazamos implantar, *no* podría haber la menor duda. Recordemos que dicha norma *no* podría ser limitada por el Tribunal a la situación de hechos que presenta el caso hoy ante nuestra consideración, esto es, al caso exclusivo de hijos habidos fuera de matrimonio que no fueron reconocidos por sus padres en forma dolosa e intencional. *Si así se limitara, la norma sería ilegal por*

*cuanto establecería una clasificación impermisible que discrimina por razón de nacimiento, que resulta violatoria de nuestra Constitución.* En este contexto, debe recordarse lo expresado por este Tribunal en *Almodóvar v. Méndez Román*, 125 D.P.R. 218, 253–254 (1990), a los efectos de que:

> ... si bien es cierto que *el análisis constitucional sobre la igual protección de las leyes* tradicionalmente se ha aplicado en el contexto de clasificaciones legislativas, *el mismo es igualmente aplicable a clasificaciones establecidas o legitimidas jurisprudencialmente.* El examen referente a estas "clasificaciones judiciales" resulta procedente pòr razón de que los derechos constitucionales se reclaman contra el Estado, y la Rama Judicial es uno de los componentes de éste. Véase L.H. Tribe, *American Constitutional Law*, 2da ed., Nueva York, Ed. Foundation Press, 1988, págs. 1482–1483. (Énfasis suplido.)

## V

En síntesis, *resolvemos que en nuestra jurisdicción no procede la acción en daños y perjuicios de un hijo, habido fuera del matrimonio, contra su padre por los daños y perjuicios que el hijo pueda haber sufrido con motivo de la negativa injustificada de reconocerlo como tal, ya que la misma atenta contra la clara política pública del Estado Libre Asociado de Puerto Rico de protección y fortalecimiento de la familia y de los lazos familiares; situación que está revestida de un claro y alto interés público.*

*Se dictará sentencia de conformidad.*

El Juez Asociado Señor Negrón García emitió una opinión disidente, a la cual se unieron los Jueces Asociados Señores Hernández Denton y Fuster Berlingeri.

— O —

Opinión disidente del Juez Asociado Señor Negrón García, a la cual se unen los Jueces Asociados Señores Hernández Denton y Fuster Berlingeri.

# I

"... [E]n el fondo de los grandes dolores humanos hay una cuestión de conducta, conducta del que los sufre y conducta de quienes acaso los producen ...." A. Posada, *Estudio sobre el Derecho y la cuestión social*, en la versión española de la obra de A. Menger, *El derecho civil y los pobres*, Madrid, Librería General de Victoriano Suárez, 1898, pág. 6. Por eso, parafraseando unos pensamientos escritos hace varios años, "[des]afortunadamente, el principio constitucional que proclama la igualdad y repudia el discrimen por nacimiento, [no] ha prevalecido. Despojada por su padre de esa condición durante toda una vida —a la ausencia del cariño y todos los beneficios y dispensa que espiritual y materialmente, de ordinario acompaña una amorosa, verdadera y normal relación paterno-filial— *hemos [optado] erigir unos obstáculos forenses y con ello agravado su situación de desposeída*". (Énfasis suplido.) *Fernández Sánchez v. Fernández Rodríguez*, 120 D.P.R. 422, 432 (1988), opinión concurrente y disidente.

La mayoría reconoce que el demandado Pablo McDougal ha incurrido en una omisión culposa, pues se negó *intencional* e *injustificadamente* a reconocer a su hija Elba María Martínez, habida fuera de matrimonio. No se cuestiona que ella haya sufrido daños como consecuencia de más de tres (3) décadas de abandono, durante las cuales se le privó del cariño y demás derechos espirituales y materiales a los que era acreedora. Naturalmente, tampoco se niega la existencia de relación causal entre la conducta culposa de su progenitor y los daños sufridos valorados en quince mil dólares ($15,000). Sin embargo, la sacrifican al concederle inmunidad al demandado McDougal con el objetivo de fomentar la posibilidad de una unión en el plano afectivo y familiar entre ambos. Opinión mayoritaria, pág. 234. Con carácter absoluto, rechazan "la adopción de cualquier norma jurisprudencial que tenga el efecto de promover la

separación, la discordia y el odio entre ese padre y ese hijo ...". (Énfasis suprimido.) Íd., pág. 233. Como razón principal aducen que, si se concede al hijo esta causa de acción, su ejercicio podría impedir el desarrollo normal de la relación paterno-filial.

Ninguna de estas razones justifican el discrimen filiatorio que hoy perpetúa la mayoría. El Tribunal no debería auspiciar una relación rota y en ruinas debido a la conducta *intencional* de un padre —que en esta etapa de la vida no puede generar confianza— para negar derechos. El inventario final mayoritario es desvirtuar los valores intrínsecos, esencia y utilidad social del *reconocimiento filiatorio voluntario presto y diligente de todo progenitor, que es la verdadera política pública encarnada en la Constitución y las leyes*. Elaboremos.

## II

Es irrazonable sujetar la conciencia y el amor paternofilial —que en esencia es libre— a la condición de que el hijo no reconocido reclame justicia cabal en los tribunales. "No podemos sustituir la devaluación de una conciencia paterna y suplir ese amor, que es por esencia libre y no coacciona y no puede ser objeto de coacción; no ordena y no puede ser compelido por medio de un mandato." L. Legaz y Lacambra, *El Derecho y el Amor*, Barcelona, Ed. Bosch, 1976, pág. 105, citado en *Fernández Sánchez v. Fernández Rodríguez*, supra. Esta posición se torna patente al examinar los hechos del caso.

Durante treinta y seis (36) años la demandante Martínez no presentó ninguna acción legal contra su padre biológico. Éste, aún después de conocer que era su hija, se negó a reconocerla y demostró no tener interés alguno en iniciar ningún tipo de relación. De hecho, incluso en su contestación a la demanda de filiación y de daños y perjuicios e interrogatorios, negó siquiera haber sostenido rela-

ciones íntimas con la madre de la demandante. Tuvo, pues, tiempo más que suficiente y amplia oportunidad de establecer relaciones paterno-filiales con su hija. No lo hizo. ¿Cómo puede la mayoría ignorar esta realidad? ¿Cómo justificar su dictamen en evitar una "separación y la discordia" (opinión mayoritaria, pág. 235) que ya existen? Los años transcurridos y la demanda judicial presentada por Elba María, ¿pueden tener otro significado?

Aún sustrayéndonos de los hechos específicos del caso, no podemos perder de vista que el elemento que da génesis, esencial en esta causa de acción, es la negativa *deliberada* e *intencional* de un padre a reconocer a quien sabe es su hijo. ¿Debemos negar un remedio redentor y justiciero en aras de la remota especulación de que el progenitor experimente un drástico cambio de actitud? Creíamos ya contestada esta interrogante, pues ante un reclamo similar dijimos que "[e]sas contingencias, más o menos remotas, no pueden servir de fundamento para derrotar la acción, cuando no hay base para invocar el principio que sirvió de fundamento a nuestra decisión en *Guerra v. Ortiz*, supra". *Fournier v. Fournier*, 78 D.P.R. 430, 434 (1955).

## III

La acción en daños del hijo contra su padre no es asunto nuevo en esta jurisdicción. En el primer caso que vislumbramos su posibilidad, no la avalamos en aras de *mantener* una relación paterno-filial *existente*, y en atención a que la conducta lesiva del padre, aunque negligente, no había sido *intencional*. Allí sentenciamos: "La negligencia de un padre en un caso de esta naturaleza *no presume ni conlleva ninguna actuación voluntaria o perversa en contra de su hijo." Guerra v. Ortiz*, 71 D.P.R. 613, 618 (1950). Posteriormente, en *Fournier v. Fournier*, supra, aclaramos que su prohibición no respondía a una inmunidad inherente de los padres frente a sus hijos, sino a consideraciones de política

pública inspirada en preservar las relaciones paterno-filiales vigentes.([1]) En consecuencia, reconocimos la causa de acción donde no había relación que proteger, "puesto que la unidad de la familia, y las relaciones paterno-filiales han desaparecido, y como cuestión de realidad, no exist[en] desde mucho antes de morir la madre ...". *Fournier v. Fournier*, supra, pág. 433. ¿Cómo la mayoría puede decir en este caso que existe una relación paterno-filial que proteger? ¿Cómo aseverar que "no existe una situación anormal que pueda tener el efecto de impedir un acercamiento entre el padre y la hija en el futuro"? (Énfasis suprimido.) Opinión mayoritaria, pág. 236.

La opinión mayoritaria se ancla en una premisa errónea. Eufemísticamente tachan las relaciones paterno-filiales de "no cordiales" e insisten en que "no existe una situación anormal". Opinión mayoritaria, pág. 236. ¿Qué mayor anormalidad que negar el *status* filiatorio a una hija durante varias décadas? Es obvio que la demanda incoada por Elba María es prueba irrefutable de que no existe la pretendida unidad familiar. ¿Por qué la mayoría insiste en imponerla? ¿Bajo qué lógica le dan efectos disociantes a la acción en daños y no a la acción filiatoria? Toda ecuación judicial debe responder a una ecuación humana: si un padre "quiere" a su hija nacida fuera de matrimonio, la reconocerá; si no, ¿qué relación hay que proteger?

Es un *non sequitur* la conclusión mayoritaria de que refrendar esta causa de acción en daños exige extenderla a

---

([1]) "Al darle allí acogida a esa doctrina, lo hicimos acertadamente, porque habiendo unidad familiar que proteger y relaciones paternofiliales que conservar, permitir que la acción tuviera éxito, hubiera sido contrario a y en detrimento y menoscabo de la política pública a la que hemos aludido. No fué ciertamente nuestra intención el enunciarla como norma absoluta, para concederle inmunidad a los padres contra acciones de los hijos basadas en culpa o negligencia, por la sola circunstancia del nexo natural que les une, sin estar justificada la inmunidad por consideraciones de orden público. El principio que proh[í]be tales acciones no es, se ha dicho, 'producto de una inhabilidad inherente del hijo para demandar al padre, estando más bien basada en el interés que tiene la sociedad en *preservar la armonía en las relaciones domésticas*'." (Énfasis suplido.) *Fournier v. Fournier*, 78 D.P.R. 430, 432 (1955).

los hijos habidos *dentro* del matrimonio. Se aduce que cualquier limitación sería un discrimen inconstitucional por razón de nacimiento. Opinión mayoritaria, págs. 236–237. Nada más lejos de la verdad. El hijo reconocido *exlex* —por razón del matrimonio— no está en la misma situación y carece del elemento primario e indispensable que nutre esta causa de acción. El razonamiento lógico y correcto es a la inversa; si se priva de ejercerla a quien no es reconocido, ¿no se le estará discriminando por razón de nacimiento? El buen propósito mayoritario, aunar los lazos paterno-filiales, no se logra inmolando derechos. Se promueve estimulando que el *reconocimiento voluntario sea lo más próximo al nacimiento*; esto es, sabiendo el padre que así evitará que surja la acción en daños y perjuicios.

Menoscaba la mayoría los valores legales involucrados. La acción en daños y perjuicios no es por incumplimiento de *"cualesquiera* de los deberes que le impone el ordenamiento a todo padre".* (Énfasis en el original suprimido y énfasis suplido.) Opinión mayoritaria, pág. 236. Es difícil concebir un incumplimiento más grave y situación más anómala y detrimental a las relaciones paterno-filiales que la deliberada y obstinada negativa de un padre a reconocer y concederle a su hijo sus derechos más básicos: nombre y alimentos.

> ... Después de todo, la *"vida se da sin contar para nada con el ser que ha de vivir. El que proviene de una unión ilegítima nace tan limpio de culpa por su parte como el que procede de una unión legítima. Sin embargo, se encuentra abandonado desde su nacimiento, no tiene familia, no siente, a veces, ni el cariño de sus padres ... ¿Debe la ley dejar a ese hijo en el desamparo, castigando en él las faltas ajenas?* La conciencia responde que no, y estima justo que esos hijos gocen, en principio de los mismos derechos que los hijos legítimos, y ya que *la ley no puede concederles cuantos lazos de afección y cuantos privilegios les arrebataron sus padres* al darles la vida, debe, al menos, reconocerles un derecho sobre los bienes de esos padres, lo mismo durante la vida de éstos que después de su muerte".* J.M. Man-

resa, *Comentarios al Código Civil Español*, 8va ed. rev., Madrid, Ed. Reus, 1973, T. VI, Vol. II, págs. 6–7. Y como nos recuerda el mismo autor —citando a Laurent— el "que da la vida a un hijo, ¿no tiene hacia él deberes que cumplir? Nadie se atreverá a negarlo. Pues bien: lo que es un deber para el padre, es un derecho para el hijo. ... A él le basta no reconocer a sus hijos, con lo cual se castiga a los inocentes, mientras que los verdaderos culpables gozan tranquilamente de su fortuna y ni siquiera sufren alteración alguna en su consideración personal. He aquí la verdadera inmoralidad que es necesario combatir". Manresa, *op. cit.*, pág. 7. (Énfasis en el original suprimido y énfasis suplido.) *Fernández Sánchez v. Fernández Rodríguez*, supra, pág. 433.

"El desposeído, el pobre, como no representa un interés poderoso, una potencia viva que en la tradición haya consagrado un egoísmo, se hallará siempre en la *lucha por el derecho* en condiciones desfavorables, porque le falta el *poder* que el *interés jurídicamente protegido* supone." (Énfasis en el original.) Posada, *op. cit.*, pág. 19. Ulpiano afirmaba que la jurisprudencia era la creencia de lo justo e injusto. El escudo protector que hoy erige la mayoría —so pretexto de una política pública pro fortalecimiento familiar— es una gran injusticia que subordina valores de mayor jerarquía, a saber, la dignidad de los seres humanos y la igualdad en materia de derecho filiatorio.