# 2006 DTA 58

**TRIBUNAL DE CIRCUITO DE APELACIONES**
**REGIÓN JUDICIAL DE BAYAMÓN**
**PANEL VII**

GLORIMAR ORTIZ ARCHILLA
Apelada

v.

JOSÉ GABRIEL PADÍN CRUZ
Apelante

Núm. KLAN-06-00006

San Juan, Puerto Rico, a 13 de marzo de 2006

Panel integrado por su Presidente, el Juez Rivera Román
y los Jueces Coll Martí y Salas Soler

Coll Martí, Jueza Ponente

## TEXTO COMPLETO DE LA SENTENCIA

Se acude en Apelación de una Sentencia notificada el 7 de octubre de 2005 por el Tribunal de Primera Instancia, Sala Superior de Bayamón, que declaró Con Lugar una Demanda en Daños y Perjuicios contra el excónyuge de la demandante por causar daños en forma culposa y negligente y otorgó la cantidad de $100,000 por graves daños emocionales permanentes, así como angustias mentales y contratiempos e impuso el pago de $20,000 en concepto de honorarios de abogado a favor de la parte demandante, aquí apelada.

Por los fundamentos que exponemos, se CONFIRMA la Sentencia apelada.

### I

La apelada presentó Demanda de Daños y Perjuicios contra el apelante por acciones negligentes culposas e intencionales cometidas por éste en contra de ella, acontecidas después de haberse decretado el divorcio entre ambos.

Luego de aquilatar los testimonios presentados por la demandante-apelada, entre ellos el de un psicólogo clínico y experto traumatólogo, así como prueba documental, el Tribunal de Primera Instancia hizo las siguientes detalladas determinaciones de hechos que se transcriben y se adoptan en su totalidad:

*"1. El 16 de abril de 2003 se notificó a ambas partes Sentencia de Divorcio en el Caso Civil Núm. DDI02-1657 del Tribunal Superior de Bayamón por la causal constituida de trato cruel por parte del Sr. José Gabriel Padín Cruz en contra de la Sra. Glorimar Ortiz Archilla.*

*2. Estando vigente Orden de Protección a favor de la parte demandante, el demandado violó dicha Orden incurriendo en conducta delictiva, por lo que se declaró culpable en el proceso criminal por violación a la Ley 54 sobre Violencia Doméstica.*

*3. Al presente continúa existiendo Orden de Protección a favor de la parte demandante.*

*4. Luego de decretado el divorcio entre las partes y estando vigente Orden de Protección, el demandado continuó acechando a la demandante en altas horas de la madrugada en la residencia de ella, burlando el control de acceso de la urbanización donde reside, haciéndose valer de un "beeper" de residente que se*

negaba entregar, hecho que motivó varios informes de Exodo Security Services, Inc. Dichas acciones privaron y continúan privando a la demandante de su descanso, paz y tranquilidad, lo que la afecta gravemente de forma emocional y en el desempeño de sus deberes en su trabajo.

5. El demandado, a pesar de estar vigente una Orden de Protección, realizaba continuas llamadas al teléfono celular de la demandante para proferirle insultos consistentes en atacar su dignidad como mujer y ser humano, llamándola "puta", "mala mujer", "inmoral", "cabrona", "bellaca", "sucia" de familia, "cafre" y "bruta", entre otros insultos; llamadas que se registran en el estado de cuenta de la demandante. Por dichas acciones, la parte demandante constantemente cambiaba su número de teléfono celular, manteniendo su número en estricta confidencialidad. No obstante, el demandado, valiéndose de alguna forma no autorizada, obtenía dicho número y, por tanto, acceso a contactar a la demandante para atacarla verbalmente a cualquier hora del día y de la noche y en cualquier lugar. Dichas acciones causaron y continúan causando grave daño emocional a la demandante, lo cual la priva de un proceso de curación o estabilización que, a su vez, le afecta su tranquilidad, paz y descanso físico.

6. El demandado escribió varios artículos en medios de comunicación, como revistas y periódicos, dirigidos a la demandante cuyo contenido es insultante y atacante a la dignidad de la demandante. Algunos de estos artículos fueron: "Carta Abierta a Glorimar Ortiz Archilla", publicado en mayo de 2003; "Reseñas Cotidianas" publicado para septiembre de 2003 y "Mitos y Realidades del Síndrome de la Mujer Maltratada". Estas publicaciones y/o escritos insultaron a la demandante públicamente atacándole su dignidad de mujer y ser humano frente a toda una comunidad, su familia y amigos. Dichas acciones causan grave daño emocional y angustias mentales a la demandante que no le permiten desempeñarse adecuadamente a nivel profesional ni personal, privándola de asociarse y de realizar actividades sociales sanamente.

7. El demandado se personó en varias ocasiones al lugar de trabajo de la demandante, Escuela Antonio Paoli de Vega Alta, en horas laborables, para allí denunciar abiertamente su opinión sobre la clase de persona que es la demandante, eso también en violación de la Orden de Protección vigente. La testigo Carmen Ortega Elías, trabajadora social del plantel escolar donde se desempeña la demandante, así como la Sra. Sonia Silva, secretaria del mismo lugar, testificaron que en varias ocasiones y en horas laborables el demandado se personó a la oficina de administración para entregarles escritos que le fueron entregados personalmente a la demandante. Ambas testificaron sobre las angustias emocionales y humillaciones que dichos escritos ocasionaron en la persona de la demandante una vez leídos por ella.

8. El demandado se mantuvo hasta el año 2004 cursando a la demandante escritos que enviaba a través del servicio postal federal, donde continuaba atacando la dignidad de la demandante y realizando amenazas a la demandante. Estas acciones privaron y privan a la demandante de disfrutar su propiedad en paz, de realizar actividades en lugares públicos y le privó de su sensación de sentirse segura en ningún momento.

9. El testigo Juan Ramón Otero testificó ser maestro compañero de trabajo de la parte demandante y el Ministro de la iglesia donde asiste la demandante con su familia. Testificó que para finales del año 2004 estando trabajando en su salón de clases escuchó la voz alta de un varón discutiendo. Al acercarse a su puerta observó al demandado que había penetrado las facilidades del plantel escolar y tenía a la demandante en las escaleras discutiéndole en alta voz. Tuvo que acercarse e intervenir a los fines de que el demandado se marchara del plantel escolar. El Sr. Juan Ramón Otero testificó que observó a la demandante quedar en estado nervioso, llorosa y en vergüenza luego del acontecimiento. Testificó, además, que para finales del año 2003, el demandado se personó a su salón de clases para citarlo a que compareciera personalmente a la oficina asignada al demandado por el Departamento de Educación-Distrito Escolar de Vega Alta – Edificio Irneo Figueroa – Piso 4. El testigo compareció encontrando allí presente una dama a quien el demandado identificó como su supervisora y quien permaneciera en la reunión como alegada testigo del demandado. Inmediatamente, el demandado le manifestó que el propósito de la reunión era desenmascarar a la demandante

*para que en su iglesia y lugar de trabajo supiesen que ésta era una "cabrona", "mala mujer", "una inmoral" y "una cristiana de apariencia" y que dichas cualidades las hiciera públicas en los indicados lugares. El Sr. Juan Ramón Otero le llamó la atención, pues lo informado eran asuntos privados que debían ser atendidos mediando ayuda profesional y abandonó el lugar de reunión. El testigo declaró que esta situación se la notificó a la demandante, entendiéndolo así su deber y que la demandante reaccionó agobiada, emocionalmente destruida y nerviosa.*

*10. El Sr. Jesús García, sobrino de la demandante, testificó que constantemente se veía precisado a acompañar a la demandante cuando ésta requería realizar gestiones fuera de su hogar o lugar de trabajo, ya que ésta temía por su seguridad. Testificó haber presenciado como el demandado, en varias ocasiones, profería a la demandante frente a sus hijos menores de edad, ataques a su dignidad e insultos. Declaró que en una ocasión en que el demandado fue a entregar a los niños, luego de darse una relación paterno-filial, el demandado llamó a la demandante en alta voz y de forma agresiva y amenazante "mala mujer", "inmoral", "mala madre". En otra ocasión se encontraba acompañando a la demandante en una actividad de niños en "Escape Town" y el demandado, en aparente acecho, llegó hasta el local y frente a sus hijos y a todo el público y amistades que allí se encontraban, en grave alta voz, comenzó a llamarla "sinvergüenza", "mala mujer", "mala madre", "de familia bruta y cafre". Testificó el señor García que la demandante quedó emocionalmente destruida, humillada ante tal bochornoso espectáculo en un lugar de festividades infantiles. Testificó que la demandante, luego de reponerse de su llanto, fue sacada del lugar y su mejor conocimiento es que no ha vuelto a ese lugar.*

*11. La Sra. Zaida Ortiz, hermana de la demandante, testificó que el demandado la llamaba a su casa y a su lugar de trabajo para insultar a la demandante y a ella misma al llamar "cafre" a la familia de la demandante y de ser "común" el apellido "Ortiz". Estas llamadas las informaba a la demandante, ya que lo entendía su deber. Declaró la testigo que la demandante reaccionaba emocionalmente afectada y humillada y que estas acciones del demandado ocasionaban que la demandante se limitara en la interacción familiar, entendiendo la testigo que el propósito de estas llamadas era crear conflictos familiares que alejarían a la demandante de su familia.*

*12. El Psicólogo Clínico y Experto Traumatólogo, Carlos Velásquez-García, compareció como testigo pericial de la demandante. Establecida la cualificación del perito a satisfacción de este Tribunal, procedió a declarar que recibió a la demandante en agosto de 2004 como paciente referida de "Refugio Eterno", lugar de refugio para víctimas de violencia doméstica, referidos por el Departamento de Justicia del Estado Libre Asociado de Puerto Rico. Declaró el perito que la demandante fue atendida con fecha previa cercana a los eventos traumáticos por el Dr. Oscar Cardona, Psiquiatra – quien diagnosticó a la demandante "Desorden Depresivo Mayor", por lo cual se le prescribió Clonazepam 0.5mg y Paxil CR 25mg, según consta de la Certificación Médica fechada 21 de octubre de 2003. Ha tratado con la demandante desde el 24 de agosto de 2004 hasta el presente, encontrando hallazgos sobre abuso físico y emocional ocasionado por la persona del demandado. Se le realizaron las siguientes Pruebas Administrativas y Fuentes de Información: Inventario Multifásico de Personalidad de Minnessota, MMPI-2; Entrevista Clínica Estructurada para Desorden de Estrés Post Trauma; Entrevista Clínica Estructurada para Desorden Depresivo y Entrevistas Colaterales con los Hijos. El perito preparó y se presentó en evidencia un Informe Confidencial de Diagnóstico y Tratamiento Psicológico fechada 23 de agosto de 2005 que refleja los siguientes hallazgos en la persona de la demandante: malestar clínicamente significativo al narrar incidentes traumáticos, recurrencia de memoria traumática, síntomas de hiper-excitabilidad como respuesta de alarma; problemas al dormir, irritabilidad, hipervigilancia; llanto incontrolable, depresión recurrente, ánimo depresivo; pobre funcionamiento físico asociado a la depresión, quejas físicas asociadas a la depresión, aislamiento; evitación social, falta de manejo del ego particularmente en dificultades para controlar o inhibir la emocionalidad y ansiedades.*

*El perito concluyó en su Informe y testificó en ratificación al mismo un diagnóstico principal de Depresión*

*que aparentemente no tendrá cambios significativos a largo plazo. Presenta, por otro lado, un patrón consistente de evitar contactos sociales por temor a ser herida; esto como un aspecto del desorden de "Estrés Post Trauma" que todavía permanece de forma prominente, realizando el perito la sugerencia que las dificultades clínicas presentadas puedan ser mayores a las establecidas en la prueba. Establece el perito que la demandante necesita continuar con psicoterapias y farmacoterapia para reducir la sintomatología refractaria (resistente al cambio) asociada al Desorden Depresivo Mayor y del Desorden de Estrés Post-trauma que sufre la demandante.*

*13. La demandante Glorimar Ortiz Archilla declaró ser víctima de los constantes ataques emocionales del demandado en fechas ulteriores a haberse decretado el divorcio legal entre ambos. A consecuencia de los acechos, persecución y ataques del demandado a sus hijos, compañeros de trabajo o en su lugar de trabajo, ante los miembros de su iglesia, su familia y frente a público desconocido en otros lugares públicos, ella ha perdido su paz, su tranquilidad, su descanso, su sensación de seguridad, su libertad de movimiento, pues se restringe de salir de su hogar a lugares públicos, ha perdido el disfrute pleno y de su propiedad que es su único hogar, ha perdido su concentración y vitalidad en el desempeño de sus funciones profesionales, constantemente siente inmensa tristeza y cansancio, no disfruta las actividades en grupos, siente constante y profunda lamentación por las consecuencias de estas situaciones en las personas de sus hijos y familiares, siente gran vergüenza, humillación e indignación frente a todos por los ataques injustificados que le causa el demandado sintiendo esto constantemente cada día de su vida.*

*14. Declaró la parte demandante que nunca ha existido entre ella y el demandado relación cordial alguna ni existe unidad familiar alguna. Por el contrario, el demandado sólo actúa con el propósito intencional de destruir la unidad familiar que ella tiene constituida con sus hijos y familiares. Declaró que una vez disuelto el vínculo matrimonial que la unió al demandado, no existe entre ellos relación familiar alguna. El demandado incumple el pago de la pensión alimentaria, adeudando al presente más de $17,000, lo que constituye un ataque directo contra la protección, bienestar y seguridad de sus propios hijos.*

*15. La parte demandante testificó que como consecuencia de tener que asistir a citas médicas y de terapias, se ha ausentado de su trabajo e incurrido en gastos económicos.*

*16. La parte demandante reclama contra el demandado el pago en concepto de resarcimiento por las graves angustias mentales y emocionales que las exclusivas acciones intencionales y culposas del demandado han causado y continúan causando en su persona. Solicita se le conceda a su favor las partidas reclamadas en su demanda a saber $475,000 así como la cantidad de $30,000 en concepto de honorarios de abogada."*

## II

El apelante en su recurso señaló los siguientes errores:

*"Erró el tribunal al asumir jurisdicción aun cuando no la tiene y al determinar que el apelante incurrió en negligencia.*

*Erró el tribunal al actuar con pasión, prejuicio y parcialidad al incorporar como parte de sus determinaciones de hechos prueba testifical y tangible contraria a la desfilada en juicio.*

*Erró el tribunal al excederse en la valoración de los daños.*

*Erró al imponer honorarios de abogado al apelante cuando éste no incurrió en temeridad."*

La parte apelada presentó su contestación al recurso de Apelación. Siendo ello así, estamos en posición de resolver.

## III

El apelante plantea que la jurisprudencia en Puerto Rico se ha negado a reconocer las acciones de daños extracontractuales entre familiares por el interés de proteger la unidad familiar y que en nuestra jurisdicción no existe remedio alguno para la apelada. Aduce que por ello los tribunales no tienen jurisdicción sobre la materia.

La línea de casos que han ido enmarcando la doctrina jurisprudencial de inmunidad interfamiliar comenzó con la decisión del caso de *Guerra v. Ortiz*, 71 D.P.R. 613 (1950), en el que un menor demandó a su propio padre luego de haber sufrido daños en un accidente de tránsito en el cual el padre conducía el vehículo accidentado. El tribunal allí resolvió que la unidad de la familia está investida de un alto interés público y social y por ello una causa de acción de un hijo no emancipado no puede prosperar en contra de su padre por los daños y perjuicios sufridos por el primero como consecuencia de los actos del padre declarando que *"esa estabilidad familiar no debe resquebrajarse a costa de obtener para el hijo una suma de dinero como indemnización por el daño causado"*. Con posterioridad, en *Fournier v. Fournier*, 78 D.P.R. 430 (1955), el tribunal permitió una acción en daños de una hija contra su padre que había asesinado a su ex-esposa y madre de esa hija por el fundamento de que entre ese padre y su hija no podría existir unidad familiar alguna en un futuro. Ya en *Drahus v. Nationwide*, 104 D.P.R. 60 (1975), se permitió que una hija demandara, bajo el Código de Seguros, a la compañía aseguradora del padre, quien era el titular del automóvil en el que la hija sufrió un accidente mientras su madre conducía. El tribunal allí razonó que, puesto que la acción no ponía en riesgo el patrimonio de los padres, no atentaba contra la unidad familiar.

En *Martínez v. McDougal*, 133 D.P.R. 228 (1993), se resolvió que es contrario al orden público permitir que una hija demande a su padre en daños porque éste se negó a reconocerla voluntariamente como hija, lo que la forzó a llevar un pleito de filiación contra él. El tribunal declaró que, aunque no existía relación alguna entre padre e hija que ameritara protección, esta relación podría florecer en el futuro, por lo que, en potencia, existía un valor que proteger.

La doctrina de inmunidad interfamiliar ha sido objeto de disputadas decisiones y, en ocasiones, de crítica severa. Se ha utilizado el interés del Estado en la unidad familiar para crear la inmunidad y para proteger ese valor de unidad se desarrolló jurisprudencialmente la norma, ahora establecida desde 1996 por la Ley 193 de 6 de septiembre de 1996, exclusivamente aplicable al campo de la responsabilidad civil extracontractual. El Artículo 1810A, incorporado al Código Civil en el año 1996, lee: *"Ningún hijo podrá demandar a sus padres en acciones civiles en daños y perjuicios cuando se afecte la unidad familiar, la institución de la patria potestad y las relaciones paterno-filiales. Disponiéndose que dicha prohibición no será absoluta y podrá ejercitarse la acción en daños y perjuicios cuando no haya unidad familiar que proteger, ni relaciones paterno-filiales que conservar."* 31 L.P.R.A. § 5150 (Supl. 2000). Más recientemente, en *Alonso García v. Ramírez*, **2001 J.T.S. 129**; 155 D.P.R. ___ (2001), un perro de los abuelos mordió al nieto menor de edad quien, asistido por su madre, demandó a los abuelos e invocó la responsabilidad absoluta del Artículo 1805 del Código Civil de Puerto Rico. El tribunal resolvió que la inmunidad que establece el Artículo 1810A del Código Civil será extensiva a los abuelos, siempre y cuando entre éstos y sus nietos exista una relación estrecha y afectuosa y cuando los abuelos ejerzan un rol en la crianza de sus nietos. Es importante la distinción que hace el tribunal en el sentido de que no será aplicable la doctrina cuando no haya unidad familiar que proteger. Por vía de *dictum*, el tribunal añade que tampoco aplicará la inmunidad cuando los abuelos, al igual que en el caso de los padres, incurran en actos torticeros que sean intencionales o delictivos. Las situaciones, en el caso de hijos y padres, en que el tribunal ha permitido la acción de daños a pesar de la doctrina de inmunidad interfamiliar, han sido situaciones que presentaron circunstancias extremas. Queda por verse a qué otros componentes de una familia se extenderá la inmunidad interfamiliar. El Artículo 1810A solamente se refiere a padres e hijos y ha sido extendido jurisprudencialmente a abuelos y nietos.

Está claro, sin embargo, que el criterio a utilizarse para determinar si ha de aplicarse la doctrina de inmunidad interfamiliar es si existe unidad familiar que proteger. Es dudoso que el mismo principio sociológico

pueda esgrimirse para evitar demandas por responsabilidad civil extracontractual entre hermanos, medio hermanos, primos u otros familiares.

En el caso que nos ocupa, donde entre dos excónyuges se ha roto toda posibilidad de relación o diálogo y el exmarido ha exhibido una conducta expresa de misoginia hacia su excónyuge, lanzando ataques abusivos y virulentos contra su integridad, dignidad e incluso su seguridad física, no queda unidad familiar presente ni futura que proteger. Tampoco hay lazos de consanguinidad ni posibilidad de que florezca una relación en el futuro.

A poco que se reflexione sobre el particular, puede concluirse que la inmunidad interfamiliar, aquí analizada, no es *"patente de corso"* que en forma indiscriminada se pueda invocar en toda relación.

No existe en este caso conflicto alguno entre el interés del Estado de proteger la unidad familiar y el derecho de la apelada a ser resarcida por los daños causados por las acciones intencionales y culposas del apelante. Extender el manto de la inmunidad en este caso sería extender impermisible e irracionalmente la doctrina para proveer impunidad ante una injusticia.

Los tribunales debemos interpretar los estatutos tomando en consideración el propósito social que los inspiró, dándoles un sentido lógico a sus diversas disposiciones y supliendo posibles deficiencias cuando sea necesario. *Sucn. Álvarez v. Srio. de Justicia*, 150 D.P.R. 252 (2000). El Artículo 1810A del Código Civil no impide, en forma alguna, esta acción en daños y perjuicios contra el aquí apelante y los Tribunales de Puerto Rico tienen jurisdicción sobre la materia.

Por otro lado, no encontramos pasión o prejuicio en las determinaciones de hechos formuladas por el Tribunal de Primera Instancia, *vis a vis* la prueba desfilada. El apelante no especifica en su escrito cuáles determinaciones de hechos fueron hechas, a su juicio, con pasión. Sabido es que los tribunales apelativos no intervendremos con la apreciación de la prueba realizada por el Tribunal de Primera Instancia en ausencia de pasión, prejuicio o error manifiesto. *Benítez Guzmán v. García Merced*, 126 D.P.R. 302 (1990); *Rivera Pérez v. Corchado*, 119 D.P.R. 8, 14 (1987); *Valencia, Ex Parte*, 116 D.P.R. 909, 912 (1986). El juzgador de los hechos, que oyó y vio declarar a los testigos y apreció su *"demeanor"*, es quien está en mejor posición para aquilatar la prueba testifical desfilada. *Ortiz v. Cruz Pabón*, 103 D.P.R. 939 (1975).

Tampoco consideramos, ante el ensañamiento tan marcado demostrado por el apelante contra la apelada, a través de una conducta deliberadamente amenazante y abusiva que terminó con la paz, la tranquilidad, la libertad de movimiento y la serenidad mental de la apelada, que el tribunal se haya excedido en su apreciación de los daños. Este Tribunal considera que no se puede siquiera aquilatar la magnitud del daño emocional y psicológico causado, ni sus secuelas.

En cuanto a la determinación de temeridad, no intervendremos con la determinación del tribunal que entendió que el apelante incurrió en conducta temeraria. Sabido es que, una vez determinada la temeridad de una parte por el tribunal, éste vendrá obligado a imponer honorarios de abogado a la parte temeraria. Nuestro ordenamiento procesal civil, de ordinario, autoriza la condena de honorarios de abogado e intereses por temeridad, conforme a las Reglas 44.1(d) y 44.3(b) de Procedimiento Civil y establecen que *"depende exclusivamente de la determinación que haga el magistrado que presidió el proceso respecto a si la parte perdedora, o su abogado, actuaron o no en forma temeraria y frívola."* Corpak, Inc. y Art Printing, Inc. v. Ramallo Brothers Printing, Inc., 125 D.P.R. 724, 736 (1990). Una vez determinada la temeridad, la imposición de honorarios de abogado e intereses por temeridad es imperativa. *Fernández Marino v. San Juan Cement Co.*, 118 D.P.R. 713 (1987); *Santos Bermúdez v. Texaco P.R., Inc.*, 123 D.P.R. 351 (1989). Ante una situación de hechos innegable, el hecho de que se trate de un asunto nunca antes considerado en nuestra jurisdicción no constituye excusa para una conducta obstinada, contumaz, temeraria o frívola. José A. Cuevas Segarra, Práctica

Procesal Puertorriqueña II, Procedimiento Civil, pág. 245, **Publicaciones J.T.S.**, *Pérez v. Colegio Cirujanos Dentistas*, 131 D.P.R. 545 (1992).

**IV**

Por todo lo anterior, se CONFIRMA la Sentencia apelada.

Lo acuerda y manda este Tribunal y lo certifica la Secretaria.

Laura M. Vélez Vélez
Secretaria del Tribunal de Apelaciones