MOISÉS ROMERO SOTO, demandante y recurrente, *v.* AMBROSIO MORALES LABOY, demandado y recurrido.

*Número:* RE-90-459          *Resuelto:* 6 de diciembre de 1993

*Rafael Cardona Campos*, abogado del demandante y recurrente; *Víctor J. Estrella Hernández*, abogado del demandado y recurrido.

LA JUEZ ASOCIADA SEÑORA NAVEIRA DE RODÓN emitió la opinión del Tribunal.

El presente recurso requiere que decidamos si debemos reconocer una acción en daños y perjuicios bajo el Art. 1802 del Código Civil de Puerto Rico, 31 L.P.R.A. sec. 5141, al cónyuge inocente contra el amante del cónyuge adúltero.

## I

*Hechos*

El recurrido, Ambrosio Morales Laboy (en adelante Ambrosio), y Eufemia Hernández González (en adelante Eufemia) contrajeron nupcias y vivieron en el estado de Nueva York desde 1964 hasta 1967. Ese año Eufemia quedó embarazada, por lo que ella y Ambrosio acordaron que ésta se trasladaría a Puerto Rico para atenderse aquí durante el embarazo. Desde que Eufemia quedó embarazada no quizo tener nada que ver con su marido. Para costear parte de los gastos del alumbramiento y cuidado prenatal, él le entregó mil ochocientos dólares ($1,800).

El niño Carlos Ramón Morales Hernández (en adelante Carlos Ramón) nació el 28 de febrero de 1968 en Aguadilla, Puerto Rico. Fue inscrito en el Registro Demográfico como hijo de Ambrosio, el recurrido, quien para esa época era el esposo de Eufemia, su madre. Luego del parto ésta rehusó

regresar al lado de su marido, quedándose a vivir en Puerto Rico.

Algún tiempo después Eufemia instó demanda de divorcio contra Ambrosio. A los cinco (5) años de haber nacido el niño, el 16 de marzo de 1973, el Tribunal Superior dictó sentencia disolviendo el matrimonio por la causal de separación.(¹)

El recurrente, Moisés Romero Soto (en adelante Moisés), vivía en Brooklyn, Nueva York para la fecha en que Eufemia y Ambrosio residían como cónyuges en ese estado. El recurrente y Eufemia, estando ésta casada con Ambrosio, comenzaron un romance y sostuvieron relaciones sexuales. Moisés ignoraba que como resultado de su romance con Eufemia ésta había quedado embarazada. No supo más de ella luego que ésta se trasladó a Puerto Rico.

Para 1971, cuando Carlos Ramón tenía tres (3) años de edad, una amiga de Eufemia le dijo a Moisés que ésta había tenido un niño. Inmediatamente Moisés quedó convencido que era su hijo. Espontáneamente comenzó a enviar ayuda económica al niño. Le enviaba de cuarenta dólares ($40) a cincuenta dólares ($50) mensualmente. El 27 de marzo de 1987, diecinueve (19) años después de haber nacido Carlos Ramón, Moisés presentó demanda contra Ambrosio impugando la paternidad de Carlos Ramón. Posteriormente enmendó la misma para incluir como codemandados a Eufemia y a Carlos Ramón.(²) En la demanda Moisés alegó que aunque Carlos Ramón había sido

---

(¹) Estos hechos demuestran que Eufemia fue quien decidió separarse de su marido, decisión que tomó desde que quedó embarazada.

(²) El recurrente enmendó la demanda en cumplimiento con la orden dictada el 3 de noviembre de 1987 a efectos de que se incluyera a Eufemia como parte indispensable. En la demanda enmendada el recurrente, además, hizo constar que Eufemia aceptaba los hechos alegados en la misma. Aunque ni Eufemia ni Carlos Ramón contestaron la demanda, Eufemia presentó un testimonio de autenticidad en el que hizo constar su conocimiento del procedimiento pendiente y aceptó que Carlos Ramón era hijo de Moisés. Además, el Tribunal Superior designó a la Procuradora Especial de Relaciones de Familia como defensora judicial de Carlos Ramón, quien en ese momento era menor de edad. Esta compareció a efectos de constatar su anuencia a que se reconociera a Moisés como padre de Carlos Ramón.

inscrito como hijo de Ambrosio, él era el padre biológico del muchacho. Además, alegó que Carlos Ramón sabía que él era su padre y que el muchacho siempre le había tratado como tal.

Ambrosio, quien para la fecha de la demanda aún vivía en Nueva York, aceptó prácticamente todos los hechos alegados en la demanda. Negó, por falta de información y creencia, que Moisés hubiera satisfecho pensión alimentaria alguna.(³) El recurrido, a su vez, instó una reconvención contra Moisés, solicitando la indemnización de treinta y dos mil dólares ($32,000) por los gastos incurridos en el sostenimiento de Carlos Ramón y cincuenta mil dólares ($50,000) por los sufrimientos y angustias mentales padecidas a consecuencia del engaño perpetrado por Moisés, "lo que ultrajó su honor de hombre". Además, alegó que había sufrido grandes angustias por los procedimientos judiciales instados por Eufemia en relación con los alimentos de Carlos Ramón.

El 12 de octubre de 1988 el foro de instancia emitió sentencia sumaria parcial declarando con lugar la demanda. Ordenó el cambio correspondiente en el Registro Demográfico para reflejar la filiación correcta de Carlos Ramón. Dicha sentencia parcial no advino final y firme por no cumplir con lo dispuesto en la Regla 43.5 de Procedimiento Civil, 32 L.P.R.A. Ap. III;(⁴) *Asociación de Propietarios v. Santa Bárbara Co.*, 112 D.P.R. 33 (1982).

Posteriormente, el 31 de mayo de 1990, el Tribunal Superior dictó sentencia disponiendo de la totalidad del litigio. El tribunal concluyó que Moisés engañó con culpa a

---

(³) El recurrido inclusive aceptó el hecho de que Carlos Ramón sabía que Moisés era su padre y que así Carlos Ramón le había tratado siempre. De esta aceptación se puede inferir razonablemente que el recurrido sabía quién era el verdadero padre.

(⁴) La Regla 43.5 de Procedimiento Civil, 32 L.P.R.A. Ap. III, en su parte pertinente, dispone de la manera siguiente: "...el tribunal podrá dictar sentencia final en cuanto a una o más de las reclamaciones o partes sin disponer de la totalidad del pleito, siempre que concluya expresamente que no existe razón para posponer dictar sentencia sobre tales reclamaciones hasta la resolución total del pleito, y siempre que ordene expresamente que se registre sentencia."

Ambrosio y además le ultrajó su honor al enamorar a Eufemia y sostener relaciones sexuales con ella. Como remedio, el tribunal de instancia concedió a Ambrosio mil ochocientos dólares ($1,800) por los gastos de cuidado prenatal y alumbramiento; siete mil cuatrocientos ochentiocho dólares ($7,488) por las pensiones alimentarias pagadas, y veinticinco mil dólares ($25,000) aparentemente([5]) por las angustias mentales y sufrimientos causados por la actuación de Moisés. Se denegó indemnización por los sufrimientos causados a consecuencia de los procedimientos de alimentos.

De esta sentencia recurre Moisés señalando, entre otros, que no procede causa de acción alguna por la alegada enajenación de afectos.([6])

## II

### *Introducción—Derecho Comparado*

#### A.  *Estados Unidos*

En el Derecho común anglosajón de Estados Unidos (*common law*) existen dos (2) causas de acción de naturaleza torticera para indemnizar los daños sufridos por la interferencia intencional con la relación matrimonial: la de alienación de afectos (*alienation of affections*) y la de trato criminal (*criminal conversation*). Los elementos

---

([5]) "Aparentemente", porque la sentencia, a manera de condena y sin mencionar los daños y perjuicios, dispone: "la cantidad de $25,000.00 por haber enamorado y haber tenido relaciones sexuales con Eufemia Hernández González mientras ésta era su esposa y convivía bajo techo con Ambrosio Morales Laboy."

([6]) También señaló como errores los siguientes:

2.  "Los pagos hechos por 'cuidado prenatal y alumbramiento' y por 'pensiones alimenticias' fueron hechos por virtud de ley o sentencia y, por ende, no dan lugar a restitución aún si se considerara la razón de pedir como un cobro de lo indebido.

3.  En la alternativa, todas las reclamaciones estaban prescritas cuando se instó la reconvención."

Por la conclusión a que llegamos no es necesario discutir estos errores.

principales de la acción de alienación de afectos son: (1) conducta intencional del demandado de alienar los afectos del cónyuge del demandante; (2) que realmente ocurra la alienación del afecto del cónyuge del demandante; (3) relación causal entre la conducta del demandado y la pérdida del afecto del cónyuge. *Dupuis v. Hand*, 814 S.W.2d 340, 343 (1991); *O'Neil v. Schuckardt*, 733 P.2d 693, 696 (1986); H. Clark, *Law of Domestic Relations*, Minnesota, Ed. West Publishing Co., 1968, pág. 263.

■ La acción de alienación de afectos evolucionó de una acción dirigida a proteger derechos propietarios a una encaminada a proteger el interés que tiene un cónyuge en la compañía y afectos del otro cónyuge. Inicialmente, esta acción se reconoció como análoga a la acción que tenía un propietario contra quien le usurpara su sirviente. Al igual que éste tenía un interés cuasi propietario sobre los servicios de su sirviente, el antiguo *common law* reconocía que el esposo tenía un similar interés sobre los servicios de su esposa. De hecho, la acción originalmente se concibió para indemnizar la pérdida de los servicios de la esposa. Es por ello que, en sus principios, solamente el marido podía instar la acción, y no fue hasta que se promulgó el *Married Women's Property Act* a finales del siglo diecinueve que la esposa tuvo igual derecho. Véanse: *Hoye v. Hoye*, 824 S.W.2d 422, 423–425 (1992); *O'Neil v. Schuckardt*, supra, pág. 696; Clark, *op. cit.*, págs. 262–263. Véase, además, P.M. Bromley, N.V. Lowe, *Bromley's Family Law*, London, Ed. Butterworths, 1987, pág. 103 y ss.

■ A pesar de que la acción de trato criminal tuvo un desarrollo similar, ambas acciones tienen elementos distintos. El demandante en la acción de trato criminal solamente tiene que probar que se cometió adulterio. Según se ha definido, el término *criminal conversation* es sinónimo del adulterio, fundándose la causa de acción en la

violación del derecho a las relaciones sexuales exclusivas entre los cónyuges.([7]) *Bearbower v. Merry*, 266 N.W.2d 128, 134 (1978); *Cottle v. Johnson*, 102 S.E. 769, 770 (1920); N.P. Feinsinger, *Legislative Attack on 'Heart Balm'*, 33 Mich. L. Rev. 979, 989 (1935). El demandante no puede haber consentido al adulterio. Todos los daños que surjan de esta actuación son recobrables y, a diferencia de la acción de alienación de afectos, no es necesario probar la pérdida del afecto del cónyuge. Clark, *op. cit.*, pág. 268; *Fadgen v. Lenkner*, 365 A.2d 147, 149 (1976).

Desde los años treinta (30), estas dos (2) causas de acción han sido objeto de severas críticas por parte de los tratadistas, la jurisprudencia y las legislaturas estatales a través de todo Estados Unidos. Su abolición ha sido universalmente proclamada. "Hay una tendencia inescapable a prohibir acciones por alienación de afectos." (Traducción nuestra.) *Fundermann v. Mickelson*, 304 N.W.2d 790, 792 (1981). Ya para 1984, "veintisiete estados y el Distrito de Columbia habían abolido la acción de alienación de afectos, tres estados habían impuesto un período de prescripción de un (1) año, y un (1) estado abolió los daños punitivos para dicha acción. Veintiún estados y el Distrito de Columbia habían abolido la acción de trato criminal mediante estatuto. Cinco (5) estados habían acortado los términos de prescripción, y cinco (5) estados habían limitado estatutariamente la cuantía de daños o costas recobrables bajo dicha acción". (Traducción nuestra.) *Cannon v. Miller*, 322

---

([7]) En Inglaterra igualmente existió la acción de trato criminal para recobrar del tercero adúltero los daños sufridos a consecuencia del adulterio. En 1875 el *Matrimonial Causes Act* abolió la acción de trato criminal, según tradicionalmente existió en el *common law*, sustituyendo esta acción por una reclamación de daños en la petición de divorcio o separación, o en una acción de daños independiente. Sin embargo, en Inglaterra nunca existió la acción de alienación de afectos. En vez existía la acción de *enticement*, muy parecida a la alienación de afectos. Ambas acciones, la de *enticement* y el derecho a recobar daños por el adulterio, fueron abolidas en 1970 mediante la aprobación del *Law Reform (Miscellaneous Provisions) Act. P.M. Bromley*, supra, págs. 120–121; J.D. Payne, *Tortious Invasion of the Right of Marital Consortium*, 8 J. Fam. L. 41, 45–47, 54 (1968).

S.E.2d 780, 795 (1984).[8] Para 1992, treinta y un (31) estados habían abolido la acción de trato criminal. *Hoye v. Hoye*, supra, pág. 426. Esto refleja un incremento de diez (10) estados que se unieron a la corriente abolicionista en un período de seis (6) años.

Son múltiples las razones para la marcada tendencia hacia la abolición de estas acciones en Estados Unidos. Se ha señalado que ambas acciones parten de una premisa hipotética incorrecta al asumir que un intruso es capaz de destruir una relación matrimonial sólida. En cuanto a este aspecto, el comentarista Feinsinger sostiene que estas acciones "parten de la hipótesis de una relación perfectamente armoniosa entre marido-mujer, la cual es destruida o deteriorada por un intruso malicioso, calculador y seductor". (Traducción nuestra.) Feinsinger, *supra*, pág. 995. Similarmente el tratadista Clark ha expresado en cuanto a la acción sobre alienación de afectos que un matrimonio sólidamente basado en los afectos de los cónyuges no puede ser destruido por un extraño. Clark, *op. cit.*, pág. 266. Además, se ha indicado que estudios psicológicos demuestran que la tercera parte en un triángulo amoroso raras veces puede considerarse como la causa principal de la comisión del adulterio. P.D. Schoonover, Comentario, *Piracy on the Matrimonial Seas–The Law and the Marital Interloper* 25 Sw. L.J. 594, 613 (1971).

Por otro lado, los comentaristas y la jurisprudencia puntualizan el hecho de que el permitir estas acciones resulta análogo a reconocer un interés propietario del cónyuge demandante sobre las emociones, los sentimientos y la persona del cónyuge demandado. Esto es un reflejo de

---

[8] En *Cannon v. Miller*, 322 S.E.2d 780 (1984), el Tribunal de Apelaciones de Carolina del Norte abolió las acciones de alienación de afectos y de trato criminal. No obstante, dicho tribunal procedió indebidamente al actuar así, ya que no tenía autoridad para derogar decisiones del Tribunal Supremo de dicho estado. Véanse: *Cannon v. Miller*, 327 S.E.2d 888 (1985); *Darnell v. Rupplin*, 371 S.E.2d 743, 746 (1988). A pesar de que *Cannon* fue revocado, el tribunal no analizó ni discutió los méritos de la cuestión. Estimamos que algunas de las expresiones y explicaciones hechas por el Tribunal de Apelaciones son meritorias y sumamente relevantes a nuestro caso.

los orígenes arcaicos sobre los cuales se fundamentan estas acciones que no tienen razón de ser en la sociedad actual. *Hoye v. Hoye*, supra, pág. 427; *Fundermann v. Mickelson*, supra, pág. 794.

A esos efectos, el tribunal de Iowa expresó:

En el análisis final estimamos que la acción [de alienación de afectos] debería ser abolida porque el amor conyugal no es propiedad susceptible de ser hurtada. No la abolimos porque los demandados necesiten o ameriten nuestra protección. Tampoco lo hacemos por algún cambio en nuestra visión en torno a las relaciones sexuales promiscuas. Simplemente lo hacemos porque los demandantes en dichas acciones no merecen recobrar por la pérdida o daño a "propiedad" de la cual no pueden ser dueños. (Traducción nuestra.) *Fundermann v. Mickelson*, supra, pág. 794.

Similarmente, expresó el tribunal estatal de Dakota del Sur:

Las esposas no son propiedad. Tampoco los maridos. El amor y los afectos de un ser humano quien se ha dedicado a otro ser humano no es susceptible de robo. Simplemente hay demasiados intangibles que desafían el concepto de que el amor es propiedad. (Traducción nuestra.) *Hunt v. Hunt*, 309 N.W.2d 818, 821 (1981).[9]

Otros critican que la naturaleza torticera de la causa de acción, especialmente en su elemento de causalidad, es muy simplista para reflejar correctamente las circunstancias y la compleja maraña de causas que convergen en un

---

[9] Además, acertadamente expresó el tribunal estatal de Carolina del Norte al intentar abolir ambas acciones, la de trato cruel y la de alienación de afectos: "[E]stamos totalmente de acuerdo con la posición judicial prevaleciente que sostiene que como ni el derecho estatutario ni el 'common law' imponen una obligación a que las personas casadas mantengan para siempre su amor o afecto el uno para con el otro, no hay base en ley ni lógica para reconocer una acción por un cónyuge contra una tercera persona a quien el otro cónyuge le ha transferido voluntariamente sus sentimientos, o con quien ha escogido llevar a cabo relaciones sexuales consensuales . ... Encontramos que hoy el concepto de que una persona posee derechos reconocidos sobre los sentimientos o actitud mental de otra persona es inherentemente ofensivo." (Traducción nuestra.) *Cannon v. Miller*, 322 S.E.2d 780, 801–802 (1984).

momento dado para desintegrar un matrimonio. Frecuentemente las razones por las que se rompe un matrimonio y por las que se comete adulterio son muchas, complejas y complicadas. Sin embargo, mediante estas acciones el ordenamiento pretende señalar como única causa responsable de dicho proceso desintegrador la actuación del tercero adúltero. Más aún, en la mayoría de las ocasiones la relación matrimonial ya se ha roto antes de que aparezca la figura del tercero adúltero y, además, es difícil, si no imposible, determinar quién es el perseguidor y quién es el perseguido en la relación adúltera. Véase Feinsinger, *supra*, págs. 995–996. Según el tratadista Clark, cualquier determinación de causa en este tipo de caso requeriría una investigación del historial matrimonial y de las motivaciones más profundas de todos los individuos envueltos. Clark, *op. cit.*, pág. 266.

Una de las críticas más fuertes que se han hecho se refiere a que estas acciones son sumamente susceptibles al abuso por parte de litigantes inescrupulosos. La mera amenaza de instar una de estas acciones puede ser suficiente para que el demandado acepte determinadas condiciones. Además, por el hecho de que, por su naturaleza, estas acciones pueden atraer mucha notoriedad y producir escándalo, el demandado, aunque inocente, puede verse presionado a tranzar el caso. El tribunal, por otro lado, se ve imposibilitado de supervisar adecuadamente las transacciones de este tipo que se lleven a cabo. *Hoye v. Hoye*, supra, pág. 427; *Dupuis v. Hand*, supra, pág. 344, citando a W. Prosser, *The Law of Torts*, sec. 124, pág. 887 (4ta ed. 1971); Feinsinger, *supra*, págs. 995–996; Clark, *op. cit.*, pág. 267.

Además de todas las críticas previamente esbozadas, los comentaristas y la jurisprudencia han concluido que estas acciones no cumplen con el propósito de fomentar la unidad familiar y de servir como elemento disuasivo al rompi-

miento matrimonial y a las relaciones extramatrimoniales. Creemos muy acertadas las expresiones del Tribunal de Apelaciones de Carolina del Norte sobre este particular:

> concediendo que el matrimonio merece la protección de la sociedad, la eficacia de estas acciones como "preservativo" nunca ha sido documentado. Al contrario, el mero hecho de instituir el litigio lo más seguro destruiría cualquier armonía matrimonial que quedara a través de la notoriedad del fracaso matrimonial y la ansiedad que produce el litigio. Igual que la disponibilidad de las acciones, no preservaría realmente la armonía matrimonial, tampoco disuadiría a demandados potenciales de involucrarse romántica o sexualmente con personas casadas. No hay duda, según se ha observado, que en el caso usual la conducta ocurre sin intención preconcebida, tornándose así el efecto disuasivo en algo improbable. (Traducción nuestra.) *Cannon v. Miller*, 322 S.E.2d 780, 800–801 (1984).

En *Fundermann v. Mickelson*, supra, pág. 791, el tribunal indicó que "[e]s una locura esperar que una persona casada que se ha inclinado a galantear pueda ser mantenido dentro de un matrimonio armonioso mediante la amenaza de una acción por alienación de afectos". (Traducción nuestra.) En igual sentido en *Dupuis v. Hand*, supra, pág. 346, el tribunal aseveró que estaba persuadido "que en el análisis final, la acción no protege ni al matrimonio ni a la familia —su única justificación real— y que el daño que ocasiona sobrepasa por mucho cualquier razón a favor de su continuación". (Traducción nuestra.)

En 1978, en *Bearbower v. Merry*, supra, Iowa abolió la acción de trato criminal. En la opinión disidente se adelantaron poderosas razones para abolir también la acción de alienación de afectos. Allí se citó extensamente de varias fuentes sobre el tema del matrimonio,([10]) y se hizo un buen

---

([10]) Las autoridades citadas son: R. Anshen, *The Family: Its Function and Destiny*, ed. rev. 1959; J. Sirjamaki, *The American Family in the Twentieth Century*, 1953; R. Cavan, *The American Family*, 4ta ed., 1969; P. Landis, *Making the Most of Marriage*, 4ta ed., 1970; P. Popenoe, *Marriage is What you Make It*, 1969; C. Broderick, *A Decade of Family Research and Action*, National Council on Family Relations, 1971; W. Lederer y D. Jackson, *The Mirages of Marriage*, 1968. Véase *Bearbower v. Merry*, 266 N.W.2d 128, 138 (1978).

análisis sobre las razones por las cuales estas acciones no fomentan la unidad familiar:

> Un denominador común permea estos estudios. El matrimonio es una unión de individuos. Se casan por motivos que frecuentemente no son racionales .... A pesar del matrimonio, los cónyuges mantienen su individualidad. Durante el transcurso del matrimonio ocurre un proceso constante de interacción. El éxito del matrimonio depende de la habilidad y la voluntad de cada cónyuge de hacer los ajustes necesarios debidos a la individualidad del otro .... La desintegración del matrimonio es ordinariamente un proceso tan complejo como el proceso de su integración. Rara vez ocurre de un día para otro. Comienza de adentro; no es causado por sólo un factor o mediante alguna imperfección de uno de los cónyuges. Cualquier tercera persona que dé una patada a alguna piedra angular de un matrimonio débil no lo derrumbará sin el apoyo activo de uno o ambos cónyuges. Es simplista e irrealista suponer que el edificio se mantendrá intacto porque uno de los cónyuges tenga derecho a obtener venganza en la forma de una demanda en daños contra la tercera persona. Aunque la indemnización de daños castigará a la tercera persona y calmará el ego del demandante, al mismo tiempo que enriquecerá su bolsillo, no se ha calculado que sea una influencia constructiva para mantener o restaurar un matrimonio maduro y estable entre dos individuos, con voluntad propia e identidad separada. ... estas acciones surgen de los mismos motivos y propósitos poco nobles del apedreamiento de la adúltera en el Nuevo Testamento o la fijación de la letra color escarlata (*scarlet letter*) censurado por Hawthorne, y no tienen más que ver con la protección del matrimonio y la familia que esos eventos. (Traducción nuestra.) *Bearbower v. Merry*, supra, pág. 138.

En 1981, en *Fundermann v. Mickelson*, supra, el tribunal de Iowa finalmente abolió también la acción de alienación de afectos.

Por otro lado, se han esbozado varios argumentos para refutar la tendencia abolicionista. Aunque las jurisdicciones estatales que han decidido reafirmar la existencia de estas acciones aceptan que las mismas presentan un riesgo de chantaje y extorsión, minimizan este argumento señalado que el sistema adversativo produce suficientes garantías contra dicha posibilidad. También se refieren al hecho

de que este riesgo existe en relación con otras acciones. *Creason v. Myers*, 350 N.W.2d 526, 528–529 (1984); *Nelson v. Jacobsen*, 669 P.2d 1207, 1216 (1983);[11] W.M. Kelly, Nota: *The Case for Retention of Causes of Action for Intentional Interference with the Marital Relationship*, 48 Notre Dame Law. 426, 430 (1972–1973). En cuanto al argumento que enfatiza el origen arcaico de estas acciones, que se remonta al tiempo en que la mujer se consideraba propiedad del hombre, éste ha refutado explicando que las acciones han evolucionado hacia la indemnización de una pérdida a nivel sentimental y personal. *Creason v. Myers*, supra, pág. 529; *Nelson v. Jacobsen*, supra, pág. 1215; Kelly, *supra*, pág. 431. Criticando la posición que sostiene que el matrimonio se debe salvar mediante amor y comunicación, y no mediante la existencia de estas acciones, algunos sostienen que esta visión ignora la malicia de la que es capaz un tercero. Kelly, *supra*, pág. 431.

También se ha sostenido que tanto la armonía del matrimonio antes de ocurrir la interferencia por el tercero, como el rol del demandante y su cónyuge en cuanto a la relación adúltera, deben de ser considerados para determinar la causalidad y la cuantía de daños, en vez de como elementos para abolir las acciones totalmente. Kelly, *supra*, págs. 431–432; *Nelson v. Jacobsen*, supra, pág. 1218. Por otro lado, el argumento que cuestiona estas acciones a base de que la determinación de daños es muy difícil, se ha echado a un lado enalteciendo la capacidad de los jurados y las instrucciones que a éstos se les imparten. Kelly, *supra*, pág. 432; *Nelson v. Jacobsen*, supra, pág. 1217; *Creason v. Myers*, supra, pág. 529. Además, se ha dicho que la dificultad en estimar daños es similar en casos de daños y perjuicios donde se concede compensación moral. Finalmente, algunos han argumentado que no importa que estas acciones

---

[11] Subsiguientemente en *Hackford v. Utah Power & Light Co.*, 740 P.2d 1281, 1286 esc. 3 (1987), el tribunal de Utah calificó como una anomalía histórica el reconocimiento hecho en *Nelson v. Jacobsen*, 669 P.2d 1207 (1983), en cuanto a la existencia de la acción de alienación de afectos.

no fomenten la preservación del matrimonio y la unidad familiar, ya que su verdadero propósito es compensar una pérdida. *Nelson v. Jacobsen*, supra, págs. 1215–1216.

Hay que notar, sin embargo, que algunos de los comentaristas que abogan a favor de las acciones torticeras por la interferencia con la relación matrimonial abogan igualmente en contra de la acción de trato criminal por adulterio. Arguyen que la sociedad de hoy aparentemente acepta más la actividad sexual extramarital y enfatizan que esta acción es muy arcaica. Kelly, *supra*, pág. 433, citando a E. Hall y R. Poteete, 5 *Psychol. Today* (enero 1972). El autor citado sugiere que para evitar injusticias, en la acción del trato criminal se debe requerir al demandante prueba de que hubo una disminución de afectos o una pérdida similar a causa del adulterio, en vez de permitir la indemnización con la mera prueba de que hubo la conducta sexual. Además, criticó que en Estados Unidos no se permita como defensa la ignorancia de que la persona era casada ni el rol del cónyuge culpable en la relación adúltera. También criticó la propensidad de los jurados a conceder daños punitivos dada la naturaleza de la acción de trato criminal y la ausencia general de defensas significativas para el demandado en dichas acciones. Kelly, *supra*, págs. 433–434.

### B. *Canadá*

Hay dos (2) herencias legales en Canadá. La mayoría de las provincias del país siguen el Derecho común inglés (*common law*), mientras que en la provincia del Quebec es más bien civilista. M. Hughes y E. Pask, *National Themes in Family Law*, Canadá, Ed. Carswell, 1988, pág. 242.

Algunas provincias de Canadá reconocieron en el pasado la acción de alienación de afectos. Sin embargo, esta acción fue eliminada jurisprudencialmente en 1962. P.B. Kutner, *Law Reform in Tort: Abolition of Liability for "Intentional" Interference with Family Relationships*, 6 Canadian J. Fam. L. 288 esc. 2 (1987). Por otro lado, en algunas

partes de Canadá todavía se reconoce la acción de trato criminal según desarrollada en el *common law*. En estas provincias no se requiere probar que el demandado haya inducido al cónyuge del demandante a tener relaciones sexuales, y tampoco se requiere que éste sepa el estado civil de su amante. Solamente se requiere probar el acto del adulterio. Íd., pág. 289. Sin embargo, en otras provincias canadienses se abolió la acción de trato criminal según el *common law* para reemplazarla por un derecho estatutario a reclamar daños por adulterio. Esto ocurrió mayormente en Canadá occidental, donde se incluyó la petición de daños en el procedimiento de divorcio o separación por adulterio. Íd., págs. 289 y 295; véase, además, Mendes Da Costa, *Studies in Canadian Family Law*, Toronto, Ed. Butterworths, Vol. 1, 1972, pág. 367 (se reconoció que la Ley del Divorcio de 1968 no derogó la acción de daños por adulterio). La mayor consecuencia que tuvo el incluir la petición de daños por adulterio en el procedimiento de divorcio o separación fue que, para resultar victorioso en la reclamación, se tuviera necesariamente que obtener el divorcio o separación por la causal de adulterio. Kutner, *supra*, pág. 295; Véase, también, Payne, *supra*, págs. 41–43.

Los mismos propósitos y críticas que se han aducido en Estados Unidos en relación con la acción de trato criminal se han esbozado en Canadá. Kutner, *supra*, págs. 296–301. Además, en Canadá se ha propuesto como posible justificación a la existencia de la acción, que ésto puede aminorar las posibilidades de una venganza violenta por parte del demandante. Este argumento, sin embargo, ha sido objeto de grandes críticas. Se ha expresado que, por lo general, la persona no sabe que tiene a su disposición esta acción. Se entera usualmente cuando consulta sus derechos con un abogado; ya para entonces la ira inicial se ha aplacado. Íd., págs. 299–301.

Ahora bien, cónsono con la tendencia abolicionista en Estados Unidos, las provincias canadienses de British Co-

lumbia, Manitoba, New Brunswick, Ontario, los territorios del Noroeste y Saskatchewan han adoptado legislación aboliendo el trato criminal y/o los daños por adulterio. Íd., págs. 325–326.

En lo que respecta a la provincia civilista de Canadá, Quebec, veamos cómo allí se ha tratado el deber de fidelidad.([12]) El capítulo 6 del título primero del Código Civil de Quebec regula los derechos y obligaciones de los cónyuges. A esos efectos, el Art. 441([13]) dispone que "los cónyuges tienen idénticos derechos y obligaciones en el matrimonio. Se deben el uno para el otro fidelidad, socorro, y asistencia. Tienen que vivir juntos". (Traducción nuestra). Este artículo reproduce sustancialmente el antiguo Art. 173 del Código Civil canadiense, que fue enmendado en la reforma del Código Civil llevada a cabo en 1981. *Report on the Québec Civil Code: Commentaries*, Quebec, Ed. Officiel, 1978, Vol. II, T. I, pág. 138; *Report on the Québec Civil Code: Draft Civil Code*; Quebec, Ed. Officiel, 1978, Vol. I, pág. 62; P.A. Crépau, *The Civil Codes—A Critical Edition*, Montréal, McGill Univ., 1986, Art. 441.

El Código de Quebec de 1981 mantiene de forma indirecta como causal de divorcio la infidelidad. El Art. 541, (equivalente al Art. 240 del *Draft Civil Code*) dispone, en parte, que "la voluntad de mantener el matrimonio se presume que ha sido irremediablemente perjudicada cuando un cónyuge incumple una obligación del matrimonio". Véase *Rapport Sur la Famille, Office de Revision du Code Civil*, Montreal, Premiere Partie, 1974, pág. 230; Crépau,

---

([12]) Es importante notar que al presente existen dos Códigos Civiles en Quebec. Por un lado, el Código Civil del Bajo Canadá que data de 1866 y el Código Civil de Quebec de 1981. Esto se explica debido a la reforma gradual que se ha estado llevando a cabo en el Código Civil desde hace más de treinta (30) años. La intención es reformar la totalidad del Código de 1866 para dejar vigente un sólo código moderno, el de Quebec. Sin embargo, como la reforma ha sido gradual y sumamente lenta, al 1986 solamente se habían enmendado 259 artículos, todos del derecho de familia. Véase *Essays on the Civil Codes of Québec and St. Lucia*, U. of Ottawa Press, 1984, págs. 16–17.

([13]) Este artículo corresponde al Art. 41 del *Draft Civil Code*, según propuesto antes de llevarse a cabo la aprobación oficial del Código vigente.

*supra*, Art. 541. El Código Civil de Quebec no contiene disposición estatutaria alguna para la indemnización de los daños ocasionados por el cónyuge culpable en el divorcio. Sin embargo, la jurisprudencia de dicha provincia ha reconocido en el pasado la acción torticera instada por el cónyuge inocente contra el tercero adúltero. G. Trudel, *Traité de Droit Civil du Québec*, Montreal, Ed. Wilson et Lafleur, 1942, T. I, pág. 496. Lamentablemente, en el curso de nuestra investigación no hemos encontrado comentario alguno que arroje luz sobre el estado actual de dicha jurisprudencia.

## C. *España*

En el derecho español la doctrina se encuentra dividida. Más bien por omisión, algunos tratadistas y comentaristas rechazan establecer como sanción al adulterio una acción torticera contra el tercero adúltero. Los autores que se expresan a favor de tal acción lo hacen someramente, sin abundar sobre los elementos, las defensas y las repercusiones de la acción. En síntesis, la doctrina en España se encuentra más bien en un estado ambiguo sobre el particular, e inclusive, algunos de los autores que antes apoyaban el reconocimiento de la acción en cuestión han cambiado su posición recientemente.

El antiguo Art. 56 del Código Civil español estatuía los deberes recíprocos de los cónyuges en el matrimonio: vivir juntos, guardarse fidelidad y socorrerse mutuamente. El texto de este artículo quedó inalterado por la reforma del Código llevada a cabo en 1981 mediante la Ley Núm. 30 de 7 de julio de 1981. Este artículo simplemente cambió de numeración convirtiéndose en el Art. 68 del presente Código español, el cual dispone de la manera siguiente: "Los cónyuges están obligados a vivir juntos, guardarse fidelidad y socorrerse mutuamente." Hay que notar que el Código español no contiene "disposición alguna concerniente a la indemnización por perjuicios, ni a la reparación del

daño moral, en relación con los motivos culpables del divorcio". L. Fernández Clérigo, *El Derecho de familia en la legislación comparada*, México, Ed. Hispano-Americana, 1947, pág. 157.

Muchos de los comentaristas españoles reconocen la separación o el divorcio como únicas sanciones al adulterio y al incumplimiento con el deber de fidelidad, descartando totalmente la indemnización torticera como remedio y sanción disponible. Antes de la despenalización del adulterio en 1973 se reconocía, además, el delito penal como sanción a dicho acto. A estos efectos, Manresa expresó: "La tendencia legislativa, fuera de España, parece encaminarse a abolir la punibilidad del adulterio *y no dejar a este otra sanción que la separación o el divorcio.*" (Énfasis suplido.) J.M. Manresa, *Comentarios al Código Civil español*, Madrid, Ed. Reus, 1956, T. I., pág. 470.

Albaladejo reconoce la separación como única sanción al incumplimiento de este deber al expresar claramente que "[e]l único remedio contra la infidelidad es la obtención de la separación (Art. 82, 1a), cuando los esposos estén ya separados falta todo remedio". M. Albaladejo, *Curso de Derecho Civil — Derecho de Familia*, 2da ed., Barcelona, Ed. Bosch, 1984, Vol. IV, pág. 128. Albaladejo considera que los deberes recíprocos de los cónyuges tienen un alto "contenido moral, y que desobedecido el que sea ... no hay generalmente posibilidad de imponer su cumplimiento forzoso específico, sino que, a lo más, en ciertos casos al ofendido sólo le cabe pedir determinados sustitutivos del cumplimiento, o únicamente tiene en su mano medios de hechos que puestos por obra fuercen al otro esposo a decidirse por cumplir, o exclusivamente le es posible, ante la conducta en que el incumplimiento consista, optar por otros caminos ... como el de solicitar la separación matrimonial". Íd., pág. 127. Así el autor citado se une a la posición que sostiene que simplemente "no hay medios legales para imponer el cumplimiento del deber de fidelidad. Y si se falta a él, no existe

otra sanción que la de permitir al ofendido que solicite la separación conyugal". Íd., pág. 130.

Similarmente Castán Tobeñas reconoce la imposibilidad de encontrar en el ordenamiento garantía o sanción adecuada al incumplimiento del deber de fidelidad. Entre las características de los deberes conyugales (*i.e.*, fidelidad, convivencia, mutuo socorro) este autor ha enumerado las siguientes: "1) depender directamente de la naturaleza y esencia íntima de la institución matrimonial; 2) ser de carácter recíproco; y 3) *tener fundamentalmente un carácter moral, sustraído casi siempre a la acción del Derecho, de tal modo que es difícil para éste dar a los mismos efectividad con sanciones eficaces.*" (Énfasis suplido.) J. Castán Tobeñas, *Derecho Civil español, común y foral*, 11ma ed., Madrid, Ed. Reus, 1987, T. V, Vol. I, pág. 240.

Carlos Vázquez Iruzubieta análogamente limita las repercusiones del adulterio al expresar que "[e]l adulterio como causa generadora más corriente de la disolución de los matrimonios va perdiendo sitio en la legislación penal comparada, porque se ha llegado a comprobar que la amenaza sancionadora de la ley no aumenta ni disminuye el valor estadístico de este deber conyugal, que una vez infringido no tiene otra sanción que la de divorcio". C. Vázquez Iruzubieta, *Régimen jurídico de la celebración y disolución del matrimonio (Ley 30/ 1981, de 7 de julio)*, Madrid, Ed. Rev. Der. Privado, 1981, pág. 229. Manuel Pons González está de acuerdo que con la despenalización del adulterio subsiste la sanción civil de la separación. Sin embargo, incluye el aspecto de la desheredación como otra sanción dispuesta por el ordenamiento al adulterio. M. Pons González y M.A. Del Arco Torres, *Separación, divorcio y nulidad matrimonial: régimen jurídico*, Granada, Ed. Comares, 1985, pág. 42.

Lacruz Berdejo, por otro lado, se basa en la intimidad de las relaciones conyugales para concluir que el ordenamiento no tiene medios *directos* o *indirectos* para hacer

valer los deberes conyugales, incluyendo el de fidelidad. A estos efectos, el autor se expresa sobre "la evidente incoercibilidad *directa* o *indirecta* de los deberes íntimos conyugales, pero esto, no exactamente en atención a los derechos de la personalidad del cónyuge casado, sino a la intimidad misma de la relación ... que impide al orden judicial entrar en el examen y prueba de sus diversos aspectos, incidencias y motivaciones". (Énfasis suplido.) J. Lacruz Berdejo, *Matrimonio y divorcio: comentarios al nuevo Título IV del libro primero del Código Civil*, Madrid, Ed. Civitas, 1982, pág. 389. Al dejar a un lado los medios directos e indirectos de coerción, el citado autor rechaza la acción de cumplimiento específico como medio directo y la indemnización torticera como medio indirecto.[14]

De otra parte, Puig Brutau, a partir de la despenalización del adulterio, considera que la obligación de guardarse fidelidad carece de toda protección coactiva.[15] Sin embargo, reconoce, igual que los otros autores citados, que la infidelidad conyugal aún se mantiene como causal de separación en el Código Civil. J. Puig Brutau, *Fundamentos de*

---

[14] Ésta, sin embargo, no fue siempre la posición de Lacruz Berdejo. En la edición de 1966 de su obra *Derecho de familia*, tomó una posición diametralmente opuesta. En dicha obra indicó como remedio indirecto al incumplimiento de los deberes conyugales la condena de indemnizar daños y perjuicios. J.L. Lacruz Berdejo y F.A. Sancho Rebullida, *Derecho de familia*, Barcelona, Ed. Bosch, 1966, pág. 77. Por otro lado, en la edición de 1978 de la citada obra expresó que el adulterio "no sólo da lugar a una acción de reclamación de daños, sino que es causa de separación de los cónyuges". J.L. Lacruz Berdejo, *Derecho de familia*, 3ra ed., Barcelona, Ed. Bosch, 1978, Vol. I, pág. 105. El autor explicó que la acción torticera contra el cónyuge culpable debía basarse en el articulado de la culpa contractual del Código Civil, ya que la obligación violentada es de naturaleza tanto legal como contractual. Véase J. Puig Brutau, *Fundamentos de Derecho Civil*, Barcelona, Ed. Bosch, 1967, T. IV, Vol. I, pág. 292. Sin embargo, no especificó que la acción se debía dirigir contra el tercero y mucho menos especificó la base sobre la cual se debía sostener la acción contra dicho tercero.

[15] Tampoco fue esta siempre su posición. En la edición de 1967, de su obra *Fundamentos de Derecho Civil*, Puig Brutau apoyó la visión de que el adulterio *debería* producir otras consecuencias en el ámbito civil, específicamente la indemnización de daños y perjuicios. Puig Brutau, *op. cit.*, pág. 292. El autor citado sugirió que la acción contra el tercero adúltero debería fundamentarse en el Art.1902 del Código Civil español, análogo a nuestro Art. 1802. Íd. En cuanto al cónyuge adúltero, estaba de acuerdo con Lacruz Berdejo en que dicha acción se debía fundamentar en el articulado de la culpa contractual, ya que se trata de una obligación tanto legal como contractual. En la nueva obra abandonó su teoría inicial.

*Derecho Civil*, 2da ed., Barcelona, Ed. Bosch, 1985, T. IV, pág. 39.

Entre los autores que apoyan el reconocimiento de una acción torticera a raíz del adulterio se encuentran Jorge Santos Briz, Carlos María Entrena Klett, Gabriel García Canteros y María del Carmen Gete Alonso. Santos Briz estima que se debería permitir una acción torticera contra el tercero adúltero. J. Santos Briz, *Derecho Civil: teoría y práctica*, Madrid, Ed. Rev. Der. Privado, 1982, T. V, pág. 96. A esos efectos, expresó lo siguiente:

> [c]reemos podría sostenerse que el adulterio causará en muchos supuestos daños a la parte inocente y a los hijos, que serán tanto daños morales como materiales, resarcibles, sino al amparo del 1902, por basarse en definitiva en el incumplimiento de un contrato ... sí al amparo de los artículos 1101 y 1106 del Código Civil, aparte de ... la acción por culpa extracontractual contra el tercero copartícipe en el acto ilícito civil de adulterio.

Este autor no discute ni los elementos de la acción ni las defensas disponibles al demandado. Tampoco abunda sobre las posibles repercusiones en el ámbito de la familia que podrían conllevar el reconocer tal acción.

Similarmente, García Cantero menciona de pasada que la obligación de abstenerse de tener relaciones extramaritales, además de ser causal de separación, "eventualmente, con carácter autónomo, *podría dar lugar* a una indemnización de daños y perjuicios al amparo del artículo 1902, [análogo a nuestro artículo 1802] especialmente los de carácter moral". (Énfasis suplido.) M. Albadalejo, *Comentarios al Código Civil y compilaciones forales*, Madrid, Ed. Rev. Der. Privado, 1982, T. II, pág. 196. Sin embargo, el citado autor no elabora contra quién podría llevarse la acción.

Por su lado, Entrena Klett sostiene que se debería conceder una acción por daños extracontractuales contra el tercero adúltero. Sin embargo, dicho autor rechaza que se reconozca la acción contra el cónyuge adúltero porque el Código Civil ya sanciona el adulterio en cuanto a éste me-

diante la figura de la separación. El citado autor expresa en relación a la presente controveria lo siguiente:

> El adulterio implica un evidente daño moral para el cónyuge inocente. ¿Es indemnizable? Tanto Lacruz como Puig Brutau se inclinan por la afirmativa en base a lo establecido en el artículo 1902 del Código Civil; nosotros seguimos el mismo criterio respecto al tercero culpable ... Más dudosa se nos plantea la cuestión en relación a la posibilidad de reclamación formulada contra el cónyuge infiel, dado que el Código Civil establece una específica sanción (la separación) para la deslealtad, que puede arrastrar perjuicios indirectos y pudiera darse un *bis in idem*. C.M. Entrena Klett, *Matrimonio, Separación y Divorcio*, 2da ed., Pamploma, Ed. Aranzadi, 1984, pág. 459.[16]

Finalmente, Gete Alonso, al enumerar los efectos civiles del incumplimiento con el deber de fidelidad indicó que "[e]n las *relaciones personales* origina, en su caso, una acción por los daños y perjuicios causados a la dignidad personal del otro cónyuge, en tanto que la infracción afecta a la esfera de su intimidad como persona y como miembro de la familia". M. Amorós Guardiola y otros, *Comentarios a las reformas del Derecho de familia*, Madrid, Ed. Tecnos, 1984, Vol. I, pág. 339. La citada autora no menciona al tercero adúltero como posible demandado en la acción torticera.

### D.  *Alemania, Francia*

La obligación de fidelidad recíproca la "consignan todas las legislaciones por ser inherente a la naturaleza misma del matrimonio". Fernández Clérigo, *supra*, pág. 68. Aunque este deber es reconocido internacionalmente, su aseguramiento es difícil. Íd.

En Alemania, al igual que en España, no se reconoce una indemnización torticera contra el cónyuge que resulta culpable en el procedimiento de divorcio. Fernán-

---

[16] Como se mencionó anteriormente, ambos autores citados por Entrena Klett han cambiado de posición.

dez Clérigo, *supra*, págs. 156–157. El matrimonio en Alemania se considera "una relación jurídico-familiar en virtud de la cual uno de los cónyuges obtiene sobre el otro un *derecho personal absoluto*, esto es, eficaz *erga omnes*". L. Enneccerus, T. Kipp y M. Wolff, *Tratado de Derecho Civil*, Barcelona, Ed. Bosch, 1953, pág. 196. Se le reconoce a los cónyuges "[p]retensiones de indemnización frente al que contra derecho y por culpa impida a un cónyuge el cumplimiento de sus deberes de tal cuando está dispuesto a cumplirlos". Íd. ¿Qué significa esta "pretensión de indemnización"?

Esta pretensión de indemnización concede una acción torticera a un cónyuge contra un tercero que perturbe la relación matrimonial. Enneccerus, Kipp y Wolff, *op. cit.* La continuada existencia de esta acción ha resultado ser sumamente controversial. M.A. Glendon, *The Transformation of Family Law: State, Law and Family in the United States and Western Europe*, Chicago, Univ. of Chicago Press, 1989, pág. 142.

Es importante notar que dicha pretensión no alcanza a un tercero que actúa de conformidad con uno de los cónyuges. Para establecer el ámbito de esta pretensión indemnizadora, los comentaristas alemanes han elucidado el significado de este concepto mediante un claro ejemplo. Si un padre encierra a su hija y le impide que ésta vaya con su marido *en contra de su voluntad*, el marido tiene derecho a la reposición natural de su esposa y la indemnización de daños causados contra el padre. Sin embargo, "[e]s distinto el problema de si el cónyuge tiene también una pretensión de indemnización contra el tercero cuando éste obra de acuerdo con el otro cónyuge. A mi juicio se ha de resolver negativamente, el tercero no responde más que el propio cónyuge. Cierto que la mujer debe fidelidad, pero la violación de este deber no la obliga a indemnizar en dinero; por la misma razón tampoco está obligado a resarcimiento el otro adúltero". Glendon, *op. cit.*, págs. 196, 204. Véase,

también, E.J. Cohn, *Manual of German Law, — General Introduction Civil Law*, 2da ed., London, Ocean Pub., 1968, Vol. I, pág. 229.

Pasemos a ver cual es la situación en Francia. El Art. 212 del Código Civil francés dispone: "Los esposos se deben mutuamente fidelidad, socorro, asistencia." En el aspecto civil, el deber de fidelidad tiene las mismas consecuencias para el hombre y la mujer. Aunque Carbonnier ha señalado que la única sanción práctica y efectiva al incumplimiento de los deberes conyugales consiste en el divorcio o la separación, el ordenamiento francés reconoce además otra sanción civil. J. Carbonnier, *Derecho Civil*, Barcelona, Ed. Bosch, 1961, T. I., Vol. II, pág. 81. El cónyuge inocente puede requerir la indemnización de daños y perjuicios contra el cónyuge adúltero y contra su cómplice. H.L. Mazeaud y J. Mazeaud, *Lecciones de Derecho Civil*, Buenos Aires, Eds. Jurídicas, 1959, 1ra parte, pág. 19; Carbonnier, *supra*, pág. 85; M. Planiol, *Treatise on the Civil Law*, Paris, 1939, Parte I, Vol. I, pág. 519. Sin embargo, resulta importante notar que la acción torticera contra el tercero adúltero en Francia ha caído en desuso. M.A. Glendon, *op. cit.*, pág. 142, citando a J. Carbonnier, *Droit Civil*, 11ma ed., París, Presses Universitaires de France, 1979, Vol. 2, págs. 22, 68. Además, hay que indicar que en Francia se le reconoce al cónyuge inocente y ultrajado el derecho a requerir del cónyuge culpable en el proceso de divorcio los daños morales y materiales sufridos a consecuencia de una causal de divorcio culpable. Fernández Clérigo, *supra*, pág. 156. Es decir, que el derecho de repetir contra el cónyuge culpable, dejando al lado el cómplice, es denominador común a toda causal culpable de divorcio en Francia. No es una característica aislada de la causal de adulterio.

Hay que preguntarse por qué en Francia, un país civilista, se reconoce la indemnización contra el tercero adúltero sin mención alguna a las complejidades paterno filiales a las que haremos referencia a continuación. En

parte esto se explica por la política pública distinta que siguen Puerto Rico y Francia a estos efectos. Aunque ambos ordenamientos jurídicos han discriminado contra los hijos ilegítimos a través de la historia, mediante la Constitución de 1952 Puerto Rico equiparó a los hijos legítimos e ilegítimos en cuanto al derecho de ser reconocidos, derecho de llevar acción de filiación y en cuanto al derecho sucesorio. Sin embargo, Francia al día de hoy mantiene en un nivel inferior al hijo adulterino. Los derechos sucesorios de éstos "son reducidos cuando concurren con el cónyuge supérstite o los hijos legítimos habidos de la unión durante la cual han sido concebidos". J. Grosliere–Couperet, *La reforma del derecho de familia: el nuevo derecho francés de la filiación*, España, 1978, pág. 47; D. Huet–Weiller, C. Labrusse y M. Van Camelbeke, *La Filiation*, París, Lib. Techniques, 1981, pág. 108.

## III

*Puerto Rico—efectos negativos de la acción en daños por adulterio sobre las relaciones paterno-filiales*

El Tribunal Superior concedió la indemnización de daños y perjuicios ocasionados por la actuación de Moisés al engañar a Ambrosio y al sostener relaciones sexuales con Eufemia, reconociendo así una causa de acción bajo el Art. 1802 del Código Civil de Puerto Rico, *supra*, por el cónyuge inocente contra el amante del cónyuge adúltero. La seriedad del problema planteado requiere que analicemos las múltiples repercusiones negativas que el reconocimiento de dicha acción podría tener sobre varios aspectos de las relaciones paterno-filiales en Puerto Rico. Una cosa es que, se pueda alegar una causa de acción y otra cosa es que, a tenor con el interés y la política pública, la reconozcamos. El problema requiere, para poder formar un juicio justo y balanceado, elucidar la procedencia de la

causa de acción en cuestión a la luz de la realidad en la que vivimos y de la naturaleza humana. Nos explicamos.

Lamentablemente, muchas de las situaciones en que se presenta una causa de acción de impugnación de paternidad, un reconocimiento voluntario o una acción de filiación envuelven relaciones adúlteras. El caso de autos es un clásico ejemplo de esto. Es decir, estas acciones que se dirigen a aclarar y a establecer el estado filiatorio de una persona, por lógica, surgen en situaciones fácticas que usualmente contienen elementos de relaciones extramaritales y adúlteras. Por un lado tenemos el elemento afirmativo que intenta proveer estabilidad y certeza al *status* de una persona, donde no la hay (la impugnación, el reconocimiento, la acción de filiación), y por otro, el elemento desequilibrante del adulterio. Con este marco de referencia, veamos las consecuencias que podría tener la acción reconocida por el tribunal de instancia.

Reconocer una causa de acción de daños y perjuicios al cónyuge inocente contra el amante del cónyuge adúltero indudablemente desalentará las acciones de impugnación de paternidad instada por el padre biológico, provocando prácticamente su erradicación. Esta acción, aún más que la situación en que se da el reconocimiento voluntario o la acción de filiación instada por el hijo, tiende a contener como un elemento fáctico el adulterio. Según expresamos recientemente, "[l]a doctrina suele hablar de impugnación de paternidad refiriéndose a la filiación matrimonial, única filiación presumida. Como señala Bossert ... 'la impugnación de la paternidad sólo es posible cuando, presumiendo la ley esa paternidad, el marido [o el padre biológico] ataca[n] la presunción. No hay acción de impugnación de la paternidad extramatrimonial ...' ". *Almodóvar v. Méndez Román*, 125 D.P.R. 218, 241 (1990).

En *Ramos v. Marrero*, 116 D.P.R. 357 (1985), reconocimos el derecho del padre biológico a impugnar la presunción de paternidad establecida por ley, que hasta ese

momento solamente se le reconocía al marido. Ahora bien, ¿qué padre biológico va a estar dispuesto a impugnar la paternidad de su hijo, arriesgando con ello que el cónyuge de su amante y hasta ese momento el padre legal del niño lo demande por daños y perjuicios? El sentido común nos lleva a la conclusión que la causa de acción reconocida por el tribunal de instancia servirá de factor disuasivo a esos efectos. Así es la naturaleza humana.

De manera similar, y desafortunadamente, la causa de acción que se intenta implantar en este caso tendrá también el efecto de desalentar el reconocimiento voluntario en los casos en que un hombre casado procree un hijo como resultado de una relación adúltera. El hombre en tal situación se vería disuadido de reconocer voluntariamente a su hijo extramatrimonial por miedo de que su cónyuge demande a su amante a base de la causa de acción reconocida por el tribunal de instancia.

Además de disuadir la impugnación de paternidad y el reconocimiento voluntario efectuados por el padre biológico, reconocer la acción en cuestión igualmente desalentaría que el hijo traiga una acción de filiación contra su padre biológico. Un hijo de madre soltera cuyo padre biológico estaba casado al momento de procrearlo, al instar la acción de filiación arriesgaría que el cónyuge o excónyuge de su padre demande a su madre fundamentándose en el derecho que reconoce el tribunal de instancia.

Finalmente, la acción en cuestión también tendría un efecto negativo sobre una madre que afirmativamente solicita los alimentos para su hijo habido de relaciones sexuales con un hombre casado. Al hacer valer el derecho fundamental de su hijo a alimentos, se expone a una acción por daños y perjuicios instada por la esposa del padre biológico.

La gran importancia que nuestro ordenamiento jurídico reconoce a los diversos aspectos de las relaciones

paterno-filiales, al bienestar del tercero inocente, el hijo, y a fomentar que una persona pueda con facilidad establecer la realidad y certeza de su *status* filiatorio, inclina, como política pública, la balanza en favor de que no reconozcamos la acción en cuestión.

Nuestro ordenamiento jurídico "reconoce la posibilidad que tienen los interesados en una filiación en particular, de promover la averiguación de la verdadera para que conste legalmente, y de promover el ataque a la que conste legalmente cuando no sea la verdadera". *Almodóvar v. Méndez Román*, supra, pág. 241. En otras palabras, hemos reconocido el interés público que permea toda acción de impugnación de paternidad, interés que quedaría socavado de reconocerse este tipo de acción.

Igualmente, hemos reconocido el *status* del reconocimiento voluntario como "el medio más importante para determinar la filiación no matrimonial". *Almodóvar v. Méndez Román*, supra, pág. 237. También hemos estimado que la filiación es la manera mediante la cual se " 'concreta la situación de cada persona dentro de la organización de la respectiva familia ...' ". Íd., pág. 233. No hay duda que el reconocimiento voluntario amerita un sitial alto en nuestro Derecho. La acción de filiación instada por el hijo es la contraparte del reconocimiento voluntario. Finalmente, de más está explicar la importancia que juega en nuestro sistema jurídico la obligación que todo padre tiene de alimentar a sus hijos y lo necesario de facilitar y viabilizar que se cumpla este deber.

No hay duda que reconocer la presente acción tiene el efecto de victimizar innecesariamente al fruto inocente de la relación extramatrimonial. Es el hijo al que se le dificultará la obtención del reconocimiento voluntario, el beneficio de dejar aclarado su *status* filiatorio verdadero mediante una impugnación de paternidad y la acción de filiación, y la obtención de los alimentos. Si bien es cierto que debemos desalentar las relaciones adúlteras, no es me-

nos cierto que en aras de propulsar este interés no debemos victimizar al fruto inocente de esas relaciones. Según expresamos recientemente, "[s]omos del criterio que el Estado puede promover y fortalecer la institución del matrimonio por otros medios. No hay necesidad de castigar al inocente". *Almodóvar v. Méndez Román*, supra, pág. 256.

A. *Efectos negativos sobre la unidad familiar*

Además, reconocer una causa de acción contra el amante del cónyuge equivaldría propiciar un ataque frontal contra la unidad familiar.(17)

En múltiples ocasiones hemos denegado la procedencia de una causa de acción bajo el Art. 1802 del Código Civil, *supra*, en aras del interés del Estado en "la unidad de la familia, la institución de la patria potestad y las relaciones paterno filiales '[las cuales] *están de por sí investidas de un alto interés público y social, tanto para beneficio del hijo como para beneficio del estado'...".* (Énfasis en el original.) *Martínez v. McDougal*, 133 D.P.R. 228, 231 (1993), citando a *Guerra v. Ortiz*, 71 D.P.R. 613 (1950).

En *Martínez v. McDougal*, supra, nos enfrentamos a la encrucijada de si admitíamos o no una causa de acción de daños y perjuicios de un hijo contra su padre por los sufrimientos provocados por la negativa injustificada de éste a reconocerle como hijo. En esa ocasión nos negamos a reconocer tal acción a base de "[n]uestra función y norte ... como tribunal de justicia, *que tiene la obligación de fomentar e implementar la política pública del Estado Libre Aso-*

---

(17) De hecho, la norma establecida también presenta un problema en relación con la litigación interfamiliar. En los casos en que surgiera una causa de acción por daños y perjuicios contra el amante del adúltero estando este último casado, solamente se podría instar la acción original contra el amante. Cabe preguntarse si éste podría ejercer posteriormente la acción de nivelación contra el cónyuge adúltero. Dicha nivelación indudablemente generaría animosidad, las relaciones tirantes que caracterizan la confrontación adversativa, además de empobrecer el capital familiar. ¿Serían estos factores suficiente fundamento para negar la nivelación a base de la inmunidad familiar? Hay que sopesar el hecho de que el daño sufrido por el cónyuge reclamante fue ocasionado, en parte, por el cónyuge adúltero. Este podría calificarse como cocausante del daño. Véase *Drahus v. Nationwide Mutual Ins. Co.*, 104 D.P.R. 60, 63 (1975).

*ciado de Puerto Rico de protección y fortalecimiento de la institución de la familia ...".* (Énfasis en el original.) *Martínez v. McDougal,* supra, pág. 233. Además, expresamos que *"[r]echazamos en consecuencia, la adopción de cualquier norma jurisprudencial que tenga el·efecto de promover la separación, la discordia y el odio ...".* (Énfasis en el original.) Íd. Entendemos que los mismos criterios y motivos que nos llevaron a negar la causa de acción en *Martínez v. McDougal,* supra, están presentes en este caso.

En *Martínez v. McDougal,* supra, la demandante radicó demanda contra su alegado padre, solicitando ser declarada como su hija. Ésta reclamó, además, los daños y perjuicios sufridos a consecuencia de la negativa injustificada de su padre a reconocerla mediante actos ocurridos antes de la presentación de la demanda. El demandado negó ser el padre inicialmente, pero luego de efectuarse los exámenes de sangre correspondientes aceptó la paternidad.

En ese caso rechazamos la causa de acción, ya que ésta "le proveería a ese hijo meramente un beneficio económico que es parcial y temporal. La misma posiblemente le impida al hijo la obtención de un beneficio mucho mayor y mejor: una relación paterno filial, afectiva y permanente, con su padre". *Martínez v. McDougal,* supra, pág. 234.

## IV

*Conclusión*

Por todos los fundamentos que anteceden, y como política pública, no procede la acción en daños instada por el excónyuge contra el tercero adúltero. La decisión a la cual llegamos, en nada afecta la impugnación de paternidad que anteriormente había sido declarada con lugar por el tribunal de instancia.

*Se dictará sentencia de conformidad con lo aquí expuesto.*

El Juez Asociado Señor Negrón García disintió con opinión escrita. Los Jueces Asociados Señores Hernández Denton y Fuster Berlingeri concurrieron sin opinión escrita.

## – O –

Opinión disidente del Juez Asociado Señor Negrón García.

Este recurso plantea, en lo principal, si de acuerdo con nuestro ordenamiento jurídico(1) cabe una acción en daños por el cónyuge víctima de un adulterio contra el tercero adúltero.

### I

En 1958 Ambrosio Morales Laboy contrajo matrimonio con Eufemia Hernández González. Después se mudaron y vivieron juntos en Nueva York. Eufemia quedó embarazada y regresó a Puerto Rico para dar a luz. Creyendo que se trataba de un hijo suyo, Ambrosio le entregó mil ochocientos dólares ($1,800) para el cuidado prenatal y el alumbramiento. El 28 de febrero de 1968 nació C.R.M.H., quien fue inscrito en el registro demográfico como hijo de Morales Laboy. Así Ambrosio siempre lo trató.

Sin embargo, la realidad era otra. Mientras Moisés Romero Soto vivía en Nueva York sostuvo relaciones sexuales

---

(1) El caso de autos presenta un aparente problema de conflicto de leyes o Derecho Internacional Privado. Como veremos, al momento de los hechos por los cuales el Tribunal Superior, Sala de Arecibo, impuso responsabilidad a Moisés Romero Soto, éste, Ambrosio Morales Laboy y Eufemia Hernández González residían en Nueva York. En ausencia de un reclamo de las partes en cuanto a que la ley de ese estado rige, hemos de presumir que están de acuerdo con que apliquemos nuestras leyes. A.A. Ehrenzweig, *A Treatise on the Conflict of Laws*, Minnesota, Ed. West Publishing Co., 1962, pág. 362; *Restatement (Second) of Conflict of Laws*, Sec. 136 comment (1971).

A tal efecto, como dato objetivo innegable, toda la argumentación de las partes ante nos gira en torno a la procedencia bajo el Derecho puertorriqueño de la reconvención instada por Morales Laboy.

con Eufemia, de quien no supo más luego que ella se trasladó a Puerto Rico.

Cuando el niño C.R.M.H. tenía tres (3) años, Moisés se enteró de que Eufemia había procreado un niño y concluyó que era suyo. A través de su madre, Moisés comenzó a enviarle entre cuarenta (40) y cincuenta dólares ($50) mensuales para su sustento. El 16 de marzo de 1973 Ambrosio y Eufemia se divorciaron por la causal de separación. Se le fijó una pensión alimentaria a Ambrosio de doce dólares ($12) semanales. El 20 de marzo de 1976 solicitó la custodia del menor. Como Eufemia trató de impedirle que se relacionara con el menor, éste dejó de pagar la pensión. Llegó a adeudar dos mil doscientos sesenta y ocho dólares ($2,268). Por tal razón, el 27 de diciembre de 1977 fue ingresado durante tres (3) días a la cárcel.

El 27 de marzo de 1987 Moisés presentó demanda de impugnación de paternidad en el Tribunal Superior, Sala de Arecibo. Al ser emplazado, Ambrosio se enteró de que C.R.M.H. no era su hijo. En su contestación aceptó que Moisés era el padre, que lo sabía y que lo trataba como tal. Instó reconvención y reclamó compensación porque "la acción del demandante reconvencionado, de engañar al demandado-reconvencionista y ultrajar su honor de hombre le ha causado al demandado reconvencionista grandes sufrimientos y angustias mentales". Contestación a demanda y reconvención, pág. 2. También pidió resarcimiento por los daños y angustias mentales causados debido a los procedimientos en su contra por el reclamo de alimentos y gastos incurridos en el sostenimiento del menor.

El tribunal (Hon. Luis R. Cruz Jiménez, Juez) declaró con lugar la demanda de impugnación de paternidad y reconvención. Estimó que las relaciones amorosas de Moisés y Eufemia, y cuyo producto fue el niño, quebrantaron el honor y le causaron angustias mentales al enterarse de que no era el padre. Le concedió a Ambrosio el reembolso de mil ochocientos dólares ($1,800) por los gastos incurri-

dos en el cuidado prenatal y parto; siete mil cuatrocientos ochenta y ocho dólares ($7,488) por la pensiones alimentarias pagadas, y veinticinco mil dólares ($25,000) por Moisés haber enamorado y tenido relaciones sexuales con Eufemia mientras ésta era su esposa y convivían bajo un mismo techo. No reconoció ni detectó nexo causal para daños por los trámites seguidos en su contra en reclamo de alimentos debido a que fueron instados por la madre y atribuibles a Moisés.

Moisés acudió ante nos argumentando que la reconvención no procedía. Plantea que la indemnización del ilustrado tribunal de instancia introdujo erróneamente a nuestro derecho la acción conocida en el derecho común como *enajenación de afectos (alienation of affections)*. Revisamos.

## II

La dignidad del ser humano, la protección de ley contra ataques abusivos a la honra, reputación y vida privada o familiar son derechos de estirpe constitucional. Art. II, Secs. 1 y 8, Const. E.L.A., L.P.R.A., Tomo 1. En *Cortés Portalatín v. Hau Colón*, 103 D.P.R. 734, 738 (1975), expusimos así el origen y criterio hermenéutico de la Sec. 8, *supra*, en torno al derecho de intimidad:

> La sección constitucional citada, propuesta por don Heraclio Rivera Colón —Proposición Núm. 11 de la Convención Constituyente— es una repetición exacta del Art. V de la Declaración Americana de Derechos y Deberes del Hombre y entronca también con el Art. 12 de la Declaración Universal de los Derechos del Hombre. Representando así esta sección, como varias otras, un principio con aspiraciones de universalidad, destilado de muy diversos sistemas jurídicos, ancho es el mundo que se nos brinda para su interpretación justa. *No se está obligado por juegos específicos de reglas históricas*. La obligación es acatar el mandato constitucional *en consonancia con otras disposiciones de nuestra ley primaria y las realidades del país*. (Énfasis suplido.)

Estos valores son multidimensionales, operan entre personas privadas y son reivindicables sin necesidad de ley que los implemente. *Figueroa Ferrer v. E.L.A.*, 107 D.P.R. 250 (1978); *Alberio Quiñones v. E.L.A.*, 90 D.P.R. 812, 816 (1964). En síntesis, el derecho a la intimidad "impone a toda persona el deber de no inmiscuirse en la vida privada o familiar de los demás seres humanos". *Colón v. Romero Barceló*, 112 D.P.R. 573, 576 (1982).

El Art. 88 del Código Civil, 31 L.P.R.A. sec. 281, establece la obligación de los cónyuges de "guardarse fidelidad", que es, ante todo, un deber de fidelidad sexual: dicho escuetamente consagra el reproche al adulterio. L. Díez Picazo y A. Gullón, *Sistema de Derecho Civil*, 2da ed., Madrid, Ed. Tecnos, 1982, pág. 113. Su incumplimiento atenta contra "la dignidad del otro cónyuge, en tanto que la infracción *afecta a la esfera de su intimidad* como persona y como miembro de la familia". (Énfasis suplido.) M. Amorós Guardiola y otros, *Comentarios a las reformas de familia*, Madrid, Ed. Tecnos, 1984, Vol. I, pág. 339. Véase, además, R. Ruiz Serramalera, *Derecho Civil: derecho de la persona*, Madrid, Imp. Fotoprint, 1985, pág. 215.

Cuando una persona casada tiene relaciones sexuales con quién no es su cónyuge, quiebra un deber jurídico sancionado tanto en la esfera penal como en la civil. En lo penal constituye el delito menos grave de adulterio, tipificado en el Art. 129 del Código Penal, 33 L.P.R.A. sec. 4147. Lo comete no sólo el casado, sino el soltero que sostiene relaciones con persona casada. En el ámbito civil representa una causal de divorcio. Art. 96 del Código Civil, 31 L.P.R.A. sec. 321.

El tratamiento dado por nuestro ordenamiento al adulterio plantea la interrogante central a este recurso; a saber, ¿existe una acción en daños contra el tercero copartícipe de adulterio?

## III

El precepto rector de responsabilidad civil extracontractual en Puerto Rico es el Art. 1802 del Código Civil, 31 L.P.R.A. sec. 5141, el cual señala que a su amparo "todo perjuicio, material o moral, da lugar a reparación si concurren tres requisitos o elementos: (1) tiene que haber un daño real; (2) debe existir nexo causal entre el daño y la acción u omisión de otra persona, y (3) el acto u omisión tiene que ser culposo o negligente". Véanse: *Bonilla v. Chardón*, 118 D.P.R. 599, 610 (1987); *Pérez Escolar v. Collado*, 90 D.P.R. 806, 811 (1964); *Hernández v. Fournier*, 80 D.P.R. 93, 96 (1957). Se trata de una "norma genérica" que nos prohíbe causar daño a otro mediante una conducta activa o pasiva; no se limita a tipos específicos de infracción. *Rivera Pérez v. Cruz Corchado*, 119 D.P.R. 8, 17–18 (1987). Véase, además, *Hernández v. Fournier*, supra, págs. 96–97.

El concepto de culpa bajo el artículo citado es "tan infinitamente amplio como la conducta de los seres humanos e incluye cualquier falta de una persona que produce un mal o daño". *Bonilla v. Chardón*, supra, págs. 610–611. Véase *Reyes v. Sucn. Sánchez Soto*, 98 D.P.R. 305, 311–312 (1970). Bajo éste, hemos reconocido una acción para resarcir lesiones a los derechos de la personalidad consagrados en el Art. II, Sec. 8 de nuestra ley fundamental, *supra*. *Colón v. Romero Barceló*, supra, pág. 577. No es necesario mucha elucidación para percatarnos que como el adulterio afecta la intimidad y dignidad del cónyuge ofendido, es ineludible concluir que éste tiene una causa de acción contra el tercero copartícipe.

A un resultado idéntico llega Santos Briz, cuyo razonamiento ejemplifica la doctrina favorable a esta causa de acción:

Los cónyuges están obligados, además, *a guardarse fidelidad*. La expresión más típica y grave de la infidelidad conyugal lo es el adulterio...creemos podría sostenerse que el adulterio en muchos supuestos daños a la parte inocente y a los hijos, que serán

tanto daños morales como materiales, resarcibles [mediante]...
la acción por culpa extracontractual contra el tercero copartí-
cipe en el acto ilícito civil de adulterio. J. Santos Briz, *Derecho
Civil: teoría y práctica*, Madrid, Ed. Rev. Der. Privado, 1982, T.
V, pág. 96.

Otros autores acordes son J. Puig Brutau, *Fundamentos
de Derecho Civil*, Barcelona, Ed. Bosch, 1967, pág. 292, y
C.M. Entrena Klett, *Matrimonio, separación y divorcio: en
la legislación actual y en la historia*, 2da ed., Pamplona,
Ed. Aranzadi, 1984, pág. 359.[2]

En el caso de autos, la conducta del demandante recon-
venido (Moisés) de sostener relaciones sexuales con Eufe-
mia (esposa del demandado Ambrosio) constituyó una ac-
ción culposa que lesionó su dignidad y el derecho a la
intimidad, causándole daños morales (sufrimientos y an-
gustias mentales) y patrimoniales (los gastos de cuidado
prenatal y alumbramiento, la pensión alimentaria). Aun-
que Moisés levantó como defensa afirmativa que descono-
cía que Eufemia era casada[3] y la sentencia no se pronun-
ció expresamente al respecto, el dictamen de imponerle
responsabilidad sólo es compatible con la conclusión de que
no logró convencer al tribunal sentenciador de la veracidad
de esa defensa.

Confirmaríamos la sentencia recurrida.

---

[2] En nuestra investigación no hemos encontrado autor alguno dentro de la doctrina española que, tomando en cuenta expresamente el problema de la posible responsabilidad civil del tercero copartícipe, rechace la procedencia de esta acción.

[3] En *El Pueblo v. Birrier et al.*, 18 D.P.R. 265, 270 (1912), resolvimos:

"Ahora bien, si la circunstancias del caso fueren tales que hubieren sido sufi-
cientes para inducir al hombre soltero o a la mujer soltera a realizar el acto con la persona casada en la creencia real y positiva de que tal persona no estaba ligada a otra por el vínculo del matrimonio, entonces tal hecho puede ser alegado como de-
fensa por la parte a quien le favorece."